UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                   :
EL'REKO D'WYANE RANDLE,                            :
                              Plaintiff,           :
                                                   :          10 Civ. 9235 (JPO)
                    -v-                            :
                                                   :          MEMORANDUM AND
SERGEANT TRACY ALEXANDER et al.,                   :              ORDER
                              Defendants.          :
                                                   :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       This civil rights case, brought by Plaintiff El'Reko D'Wyane Randle pursuant to 42

U.S.C. § 1983, against a number of prison officials, arises from serious allegations of abuse and

neglect within the prison system.  Before the Court is Defendants' motion to dismiss the Third

Amended Verified Complaint ("TAC") pursuant to Federal Rules of Civil Procedure 12(b)(1),

12(b)(3), and 12(b)(6).  For the reasons that follow, Defendants' motion is granted in part and

denied in part.

I.     **Background**

       A.     **Factual Background**[1]

       Plaintiff El'Reko D'Wayne Randle ("Randle" or "Plaintiff") is currently a prisoner in the

custody of the New York State Department of Corrections and Community Supervision

("DOCCS").  During late 2008 and early 2009, when the events giving rise to this suit occurred,

Randle was housed at Green Haven Correctional Facility ("Green Haven"), within the protective

custody unit commonly referred to as "the Company."

---

[1] For the purposes of this motion, the facts are taken from the TAC (Third Amended Verified
Complaint, Dkt. No. 60 ("Compl.")) and are presumed true.

There are several defendants in this action.  Defendant Officers Dennis Benitez, William Monzon, H. Hanaman, and K. Nelson (together, the "Guard Defendants") were all correctional officers at Green Haven during the relevant time.  Defendants Tracy Alexander and Robert Ercole were, respectively, a sergeant at and the Superintendent of Green Haven while Randle was incarcerated there.

Defendant Marinelli was Randle's therapist during and prior to Randle's suicide attempts. Defendant Doris Ramirez-Ramero was the Director of Correctional Mental Health Services during Randle's time in the Group Therapy Program ("the GTP").

John Carvill, Zaida Chase, Betsy Smith, and Mariann Amodio were CLM Reviewers working for the DOCCS Office of Classification and Movement while Randle was maintained in the GTP.  Steven Kaska and Sean Duncan were IG Reviewers working for the Office of the Inspector General during the relevant time period.  Donald Selsky and Kenneth Decker were both working for the Assistant Commissioner of DOCCS during the relevant time; and Ryan McNulty, Melissa Collins, Mitchell Lake, and Charles Gordon were all Mental Health Reviewers working for the DOCCS Bureau of Mental Health during the relevant time period.  Timothy Votraw and Albert Prack were Special Housing reviewers for the Special Housing/Inmate Disciplinary Program while Randle was housed in that unit.  Collectively, the aforementioned defendants in this paragraph are referred to as "the Mental Health Defendants."

While Randle was incarcerated at Green Haven, he interacted with Benitez frequently, as Benitez was one of the guards who regularly worked shifts on the Company.  Benitez frequently encouraged inmates within the Company to harass and punish inmates whom Benitez disliked. These harassing inmates acted as Benitez's agents, whom he utilized to inflict punishment on those inmates he targeted.  Moreover, it was common knowledge within the Company that

2

inmates could approach Benitez for "permission" to fight another inmate.  Benitez, in turn, would encourage these fights and would sanction inmate fighting, particularly when he did not like the inmates involved.  Benitez frequently suggested areas to inmates where these fights could occur, uninterrupted.  As a result of Benitez's behavior, inmates frequently filed grievances about these fights and harassment; however, nothing ever changed.

Randle was one of the inmates whom Benitez disliked, and Benitez routinely "roughed up" Randle's cell more than necessary for the sole purpose of intimidating Randle.  Benitez also filed various false reports against Randle.

Melvin Johnson was another inmate housed at Green Haven in the Company, as he too necessitated protective custody.  Johnson was also disliked by Benitez and the Guard Defendants.  Though Randle bore no ill will toward Johnson, Benitez and Monzon would frequently make harassing comments to Randle, suggesting that Randle and Johnson disliked each other.  These intimations culminated in December 2008, when Benitez approached Randle and stated that Johnson and Randle should fight each other.  Benitez explained that, as was Benitez's practice, he would not report Randle, or otherwise discipline him, if he fought Johnson—so long as no weapons were used.

Benitez added that Randle should not be afraid to fight Johnson, as Johnson was a "bitch."  Benitez's assessment of Johnson as a "bitch" derived from Benitez's own interaction with Johnson, when Benitez himself had challenged Johnson to a fight, and Johnson had refused, or, in Benitez's words, had "bitched up."  Benitez added that if Randle fought Johnson in a secluded area in the back of the Company, he would not file misbehavior reports against either inmate.  It was also well known throughout the Company that Benitez disliked Johnson, and

Benitez told at least one other inmate that Benitez was "just waiting" for that inmate to fight Johnson.

Randle refused Benitez's offer to fight Johnson, and in response, Benitez threatened Randle, stating that if Benitez caught Randle fighting without his prior approval he would diffuse the fight with his "stick"—referring to his baton—and send someone "upstairs"—referring to the Special Housing Unit—"broken up," meaning bruised and beaten.  Randle understood this threat to mean that if Randle ever got into a fight without first seeking Benitez's approval, Benitez would beat him with his baton.

Monzon knew of Benitez's feelings towards Johnson, and that Benitez approved of inmates fighting each other within specified conditions as a general rule.  Moreover, Monzon once suggested to Randle that there was tension between Randle and Johnson.  However, Randle disagreed with this characterization.

In a further attempt to incite a fight between Randle and Johnson, Benitez next went to Randle's cell and told Randle that Johnson had written a letter to the prison administration falsely stating that Randle was keeping weapons within his cell.  Randle went to Johnson's cell to discuss this issue with him, and the two engaged in a brief fistfight while inside Johnson's cell.  Monzon, who was near Johnson's cell at the time, told Randle and Johnson to stop fighting, a request with which the two immediately complied.  Monzon next ordered Randle to leave Johnson's cell, locked Johnson's cell, frisked Randle, and took Randle—without handcuffs or restraints—to the area in front of the Company known as the "A-1 mantrap."

Monzon told Hanaman and Nelson that there had been a fight in the Company, and a few minutes later, Benitez brought Johnson—also without restraints—to the A-1 mantrap area.  One of the officers proceeded to unlock the door to an open area in front of the mantrap known as the

4

"CO Bubble," and Randle and Johnson were ordered to step through the Company's entrance/exit door.  Benitez also told Hanaman and Nelson to ensure that all of the other inmates within range were locked within their cells.

At this point, Benitez asked Johnson and Randle if they wished to finish their fight, stating that they had five minutes to "finish what y'all started."  The Guard Defendants, who were all present at the time, heard Benitez make this statement to Johnson and Randle.  Randle refused, stating that the fight was over.  Benitez, dissatisfied that Randle and Johnson would not continue their fight, took out his baton and tapped it on his hand, and reminded Randle of his prior warning about the consequences of getting into a fight without Benitez's prior approval. Benitez proceeded to tell Randle and Johnson that they had to "finish" the fight, while the Guard Defendants watched, and if they refused, Benitez would beat them with his baton and tell his supervisors that Randle and Johnson had received their injuries while fighting each other.

At this point, Hanaman and Nelson, who were inside the CO Bubble's control panel, made cat calls and side comments.  Monzon, Hanaman, and Nelson together agreed that they too would corroborate Benitez's story to their supervisors, each stating their version of the planned statements to cover up Benitez's beating of Randle and Johnson.

In light of what Randle and Johnson perceived as Benitez's credible threat, Johnson attacked Randle, and the two began to fight as Benitez and the Guard Defendants watched and mocked the inmates.  During the course of the fight, Johnson fell to the ground.  Alexander arrived after Johnson fell, and remarked "why is this piece of shit laying out in my hallway?"  In response to Alexander's query, the Guard Defendants told Alexander that a fight had started in Johnson's cell, to which Alexander replied "and it ended out here?"  Benitez then stated, "basically."

5

In the aftermath of the incident, both Randle and Johnson were taken to the clinic, where Randle was treated for a hand injury.  Johnson died a few days later from his injuries.  Following the fight, Benitez, Alexander, and the Guard Defendants wrote false reports concerning the fight, covering up its true circumstances.  Randle was later visited by New York state police officers, and during the conversation Randle explained what had happened.  The officers observed that there were shadows under the door, indicating someone was eavesdropping on their conversation, and then stated that Randle would need to be transferred for his own safety.  Randle was later transferred to Upstate Correctional Facility, where he was subsequently threatened about the fact that he had filed grievances against Benitez, Alexander, and the Guard Defendants.

Randle has a documented history of serious mental illness, and his mental health deteriorated further in the wake of the forced fight.  For example, Randle began experiencing flashbacks of the fight and heard Johnson's voice inside his head.  At his disciplinary hearing for the fight, Randle accordingly requested that he be placed in a mental health services program, but he was left untreated.  These latent mental health issues, exacerbated by the fight, resulted in 3 separate suicide attempts by Randle.

In the wake of the suicide attempts, Randle was placed in the GTP at Clinton Correctional Facility.  The Clinton GTP was intended to be a short-term program lasting around 90 days with good behavior, with the participant then being promoted to a less restrictive program.  While in the GTP, Randle was kept in Special Housing Unit ("SHU") conditions, together with SHU prisoners.  Randle remained in the GTP for over two years without advancement or relocation into a less restrictive program, despite the fact that he willingly

participated and progressed within the programs.  Randle's time in the GTP and within SHU-like conditions caused his mental health to deteriorate significantly.

In July 2010, the New York State Office of Mental Health sent Randle a letter stating that he was "referred and accepted to Great Meadow BHU, but then denied by DOCS for transfer after [he] had been approved."  Later, in August 2010, Randle sent Diane Van Buren, the Assistant Commissioner, a letter explaining that he had been in the Clinton GTP since April 2009, that he had spoken to Van Buren twice since arriving in GTP, and that she had indicated to Randle that he should have been moved to a less-restrictive program.  Randle's family began calling the DOCCS offices in Albany in an attempt to stop Randle's mistreatment within the GTP and Clinton Unit 14 SHU.  Following the calls, however, Randle was again inappropriately transferred to other SHU-like facilities, without regard to his mental health condition.

### B.  Procedural Background

Randle first filed his *pro se* complaint in this case in December 2010.  (Dkt. No. 2.)  In September 2011 several Defendants moved to dismiss Randle's first complaint.  In January 2012, the Court denied Defendants' motion to dismiss and granted Randle permission to file a Second Amended Complaint.  (Dkt. No. 34.)  Magistrate Judge Kevin Nathaniel Fox granted Randle's application to appoint counsel on March 22, 2011, directing the Pro Se Office to identify an attorney whom the Court could appoint to represent Randle.  (Dkt. No. 8.)  Pro bono counsel entered an appearance on Randle's behalf in February 2012, and Randle filed his Second Amended Complaint in April 2012.  (Dkt. No. 45.)  In August 2012, with the Court's permission, Randle filed the TAC.  (Dkt. No. 60.)  In November 2012, Defendants filed a motion to dismiss Randle's TAC (Dkt. No. 86); Randle opposed the motion in December 2012 (Dkt. No. 95); and Defendants replied in February 2013.  (Dkt. No. 98.)

7

In his TAC, Randle asserts five claims—all pursuant to 42 U.S.C. § 1983—which are as follows: (1) cruel and unusual punishment in violation of the Eighth Amendment; (2) conspiracy to engage in a violation of the Eighth Amendment; (3) violation of the Equal Protection Clause; (4) retaliation in violation of the First Amendment; and (5) deliberate indifference to serious medical needs in violation of the Eighth Amendment.

## II.  Legal Standard

### A.  Motion to Dismiss Standard

Pursuant to Rule 8(a)(2), a complaint must contain only a "short and plain statement of the claim showing that the pleader is entitled to relief."  "To survive a motion to dismiss under Rule 12(b)(6), however, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"  *Cruz v. Rose Associates, LLC*, No. 13 Civ. 0112 (JPO), 2013 WL 1387018, at *1 (S.D.N.Y. Apr. 5, 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  When "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the claim is said to possess facial plausibility.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (noting that a plaintiff must plead "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level'" (quoting *Twombly*, 550 U.S. at 546)).  Though *Iqbal* and *Twombly* necessitate plausibility, they do not contemplate a "heightened standard that requires a complaint to include specific evidence, factual allegations in addition to those required by Rule 8 . . . ."  *Artista Records, LLC v. Doe 3*, 604 F.3d 110, 110 (2d Cir. 2010).  Moreover, plausibility is not akin to probability, but rather a lesser burden.  *See Twombly*, 550 U.S. at 556.

In deciding a motion to dismiss, courts are required to "accept as true all of the factual allegations contained in the complaint," *id.* at 572 (quotations omitted), drawing "all inferences in the light most favorable to the non-moving party[] . . . ," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). Nevertheless, "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### B.     Eighth Amendment Claims Generally

The Eighth Amendment, from which the majority of Randle's claims derive, provides that "cruel and unusual punishments [shall not be] inflicted." U.S. Const. amend. VIII. "That rule, applicable to the states through the Fourteenth Amendment, is violated by unnecessary and wanton inflictions of pain and suffering." *Walker v. Schriro*, No. 11 Civ. 9299 (JPO), 2013 WL 1234930, at *11 (S.D.N.Y. Mar. 26, 2013) (citations omitted). While prison officials are indisputably responsible for inmate safety, "[i]t is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for [the] prison officials [involved]." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Instead, prison officials violate the Eighth Amendment only when two requirements are met: (1) the alleged deprivation must, as an objective matter, be "sufficiently serious," and (2) the alleged perpetrator—ordinarily a prison official—must possess a "sufficiently culpable state of mind." *Id.* (quotations omitted). In the context of prison conditions, courts have defined this culpability as "deliberate indifference" to the health and safety of inmates. *See Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 302-04 (1991) (applying deliberate indifference standard to conditions of confinement claim); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

An objective analysis of the seriousness of the conduct at issue mandates an examination on the putatively unconstitutional conditions. And while comfort within prisons is not

constitutionally required, *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ("[T]he Constitution does not mandate comfortable prisons . . . ."), prisoners are entitled to satisfaction of their "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989)). "Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002). As for the second element of an Eighth Amendment claim, namely, an accused prison official's subjective intent, "a plaintiff must show something more than mere negligence." *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (quotations omitted). Instead, "[a] prisoner injured while in custody may recover for violation of his Eighth Amendment rights [only] if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d. Cir. 1997) (quoting *Farmer*, 511 U.S. at 834). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Cuoco*, 222 F.3d at 107 (quotations and citations omitted).

There are three basic theories pursuant to which inmates customarily bring Eighth Amendment claims: (1) denial of adequate medical care; (2) unconstitutional conditions of confinement unrelated to medical care; and (3) failure to protect. First, it is well established that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104

(quotations and citation omitted).  This is the case "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Id.*  (footnotes omitted).  Second, a prisoner may allege an Eighth Amendment violation relating to unconstitutional conditions of confinement unrelated to medical care, including access to "adequate food, clothing, [and] shelter."  *Dilworth v. Goldberg*, No. 10 Civ. 2224 (JMF) (GWG), 2012 WL 4017789, at *23 (S.D.N.Y. Sept. 13, 2012) (quotations and citation omitted).

Finally, it is well established that "[t]he Eighth Amendment imposes a duty on prison officials to 'take reasonable measures to guarantee safety of the inmates.'"  *Nunez v. Goord*, 172 F. Supp. 2d 417, 430 (S.D.N.Y. 2001) (quoting *Farmer*, 511 U.S. at 832).  Accordingly, "[i]t is settled that, under the Eighth Amendment, 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'"  *Hines v. Lacy*, No. 98-2961, 189 F.3d 460, at *3 (2d Cir. Aug. 20, 1999) (unpublished table) (citations omitted).  For example, "an inmate's claim that prison officials failed, as a result of their deliberate indifference, to protect him from the violent actions of other inmates may state a viable § 1983 cause of action."  *Hendricks v. Coughlin*, 942 F.2d 109, 113 (2d Cir. 1991); *accord Snider v. Dylag*, 188 F.3d 51, 55 (2d Cir. 1999) ("If Dylag did, in fact, declare 'open season' on Snider, indicating to other inmates that their abuse of Snider would be unimpeded by prison officials, deliberate indifference to Snider's safety would be obvious.").  At bottom, prison officials may not abuse prisoners directly, nor may they indirectly subject prisoners to harm by facilitating abuse at the hands of prisoners' fellow inmates.

## C.     Qualified Immunity

In defense to some of Plaintiff's claims, Defendants assert qualified immunity.  (Def.'s Mem. at 12.)  Qualified immunity protects state officers, such as police officers and prison officials, from liability associated with their discretionary actions whenever: (1) "[the] 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *or* (2) "it was 'objectively reasonable . . . to believe that [their] actions were lawful at the time of the challenged act.'"  *Id.* (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (internal quotations omitted)).  Qualified immunity is an affirmative defense; however, it reflects "an *immunity from suit* rather than a mere defense to liability."  *Mitchell v. Forsyth*, 472 U.S. 511, 552 (1985) (emphasis in original) (quotations and citation omitted).  Accordingly, it is appropriate to decide the issue of qualified immunity, when raised, at an early stage of the litigation, such as when deciding a pre-answer motion to dismiss.  *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998) ("It is also well established that an affirmative defense of official immunity should be resolved as early as possible by the court, and may be resolved by Rule 12(b)(6) if clearly established by the allegations within the complaint." (citations omitted)); *Torres v. Vill. of Sleepy Hollow*, 379 F. Supp. 2d 478, 483 (S.D.N.Y. 2005) ("[T]he availability of qualified immunity ought to be decided by a court at the earliest possible opportunity—preferably at the outset of the case, at which point plaintiff's well pleaded allegations are assumed to be true, and defendant's version of the facts is immaterial.").

**III.     Discussion**

As discussed, in the TAC, Plaintiff specifies five causes of action: (1) cruel and unusual punishment under the Eighth Amendment; (2) conspiracy to engage in violations of the Eighth Amendment; (3) violations of the Equal Protection Clause; (4) retaliation in violation of the Eighth Amendment; and (5) deliberate indifference to serious medical needs.  These claims relate to two events: first, the forced fight between Randle and Johnson, together with the general occurrence of such fights; and second, the extended, retaliatory incarceration of Randle in the GTP, in SHU-like conditions, and subsequent indifference to the deterioration of his mental health.  The claims relating to each occurrence are addressed in turn.

**A.     Allegations Relating to the Forced Fight**

Plaintiff's claims relating to the forced fight between Plaintiff and Johnson derive from several theories of liability.  Each theory is addressed in turn.

**1.     Eighth Amendment Claims**

**a.     Excessive Force Claims**

Plaintiff contends that Benitez's credible threats to beat Plaintiff and Johnson if the two did not engage in a forced fight constitute use of excessive force in violation of the Eighth Amendment.  (Pl.'s Opp. at 15.)  In their motion, Defendants assert that verbal threats are insufficient to give rise to a § 1983 claim based on the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.   (Def.'s Mem. at 11.)  The Court agrees with Plaintiff.

First, it is well established that whenever prison officials "maliciously" and "sadistically" utilize force to cause harm to inmates, the "contemporary standards of decency," relevant to a determination of the objective seriousness required for an Eighth Amendment analysis, are "always violated."  *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  Prison officials may apply

force "in a good faith effort to maintain or restore discipline," *id.* at 6 (quotations omitted); what they may not do, however, is apply such force in bad faith. *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999). Moreover, as noted, whenever force is applied maliciously or sadistically, regardless of injury, the Eighth Amendment is violated. *Nunez*, 172 F. Supp. 2d at 432 ("[P]rison officials' malicious and sadistic use of force is a *per se* violation of the Eighth Amendment, because that conduct, regardless of injury, 'always' violates contemporary standards of decency." (citing *Hudson*, 503 U.S. at 9, 112 S. Ct. 995; *Blyden*, 186 F.3d at 263). It is axiomatic, however, that a *de minimis* use of force is non-actionable under the Eighth Amendment. *Id.* (citation omitted).

Here, Benitez allegedly forced Randle to fight Johnson, threatening to beat him with his baton if the two did not "finish" their fight within the CO Bubble. And while the resultant injury to Randle's hand was not life threatening, a forced fight is not the push or shove "one might expect in a crowded prison corridor." *Abreu v. Nicholls*, 368 Fed. App'x 191, 194 (2d Cir. 2010). Instead, an officer's intent to harm inmates by forcing them to fight each other is more akin to "a calculated effort to apply a moderate amount of force in a way that threatened the use of significantly greater force." *Id.*

It is no answer to Randle's claims, as Defendants contend, that Benitez's threats constitute mere verbal harassment, which is non-cognizable under the Eighth Amendment. While it is well established that verbal harassment and name-calling on the part of prison officials do not constitute actionable constitutional violations, *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *accord Harris v. Lord*, 957 F. Supp. 471, 475 (S.D.N.Y. 1997), the allegations here are of a different sort. Randle bases his excessive force claim not on Benitez's *verbal* threats, but rather on the fight itself. Courts have recognized that such claims are

actionable within the Eighth Amendment context.  *See Northington v. Jackson*, 973 F.2d 1518,

1525 (10th Cir. 1992) (holding that a complaint alleging that prison guards incited other inmates

to beat the plaintiff stated a cognizable excessive force claim, because "[w]hen an inmate is able

to prove such intent, it is as if the guard himself inflicted the beating as punishment"); *cf. McGill*

*v. Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991), *overruled in part on other grounds by Farmer*,

511 U.S. at 825 (noting, in the failure to protect context, "[i]f prison officials put McGill into the

IDU so that a bigger inmate would have a better chance to rape him, then it is as if the officials

inflicted that pain and humiliation themselves").

Here, the force as alleged had no legitimate penological purpose, and was far afield of the

species of force employed to restore or maintain discipline.  There can be no good faith where an

officer forces prisoners to fight each other, as Randle claims here.  Moreover, the Court adopts

the reasoning of the Tenth Circuit in *Northington*, holding that when an officer incites prisoners

to fight each other, it is as if the officer himself employs the force used.  Accordingly, Randle

states a cognizable excessive force claim against the Guard Defendants[2] under the Eighth

Amendment.

### b.      Failure to Protect Claims

Alternatively, Randle alleges that the Guard Defendants failed to protect him during the

forced fight, stating a claim under the Eighth Amendment.  In response, Defendants contend that

---

[2] Randle states an excessive force claim against Benitez directly, and against Monzon, Hanaman, and Nelson pursuant to a failure to intervene theory.  *See, e.g.*, *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.  An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know:  (1) that excessive force is being used (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." (citations omitted)).

any injury or threatened injury suffered by Randle stemmed from his own aggression toward Johnson, rather than Defendants' failure to protect.

As discussed, a prisoner may state an Eighth Amendment claim under the theory that prison officials failed to protect him or her. *See Farmer*, 511 U.S. at 845. For the objective component of this type of claim to be satisfied, "the inmate must show that he is incarcerated under conditions posing a *substantial risk of serious harm.*" *Id.* at 835 (emphasis added); *accord Heisler v. Kralik*, 981 F. Supp. 830, 836 (S.D.N.Y. 1997). Additionally, subjectively, "the prison official [must] have a 'sufficiently culpable state of mind,' to wit, be deliberately indifferent to the harmful conditions." *Id.* at 836 (quoting *Wilson*, 501 U.S. at 297).

Importantly, the objective prong can be satisfied even where no serious physical injury results. *See id.* ("[T]he Court does not accept defendants' position that prison officials are only liable for failing to protect an inmate from an attack by another inmate when a serious physical injury has resulted from the attack. If accepted, such an analysis would assess a prison official's actions based on hindsight, rather than on the facts and circumstances of which the official was aware at the time he acted or failed to act." (internal footnote omitted)). At bottom, "[i]n assessing whether the risk of an inmate's violence against other inmates is 'sufficiently serious,' to trigger constitutional protection, the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm.'" *Id.* at 837 (quoting *Wilson*, 501 U.S. at 298 (internal citation omitted)).

Here, there can be no legitimate contention that Randle fails to state an objectively serious risk of harm. Defendants nevertheless try, arguing that Randle's injuries stem from his own aggression, rather than any act committed by Defendants. In support of their contention, Defendants cite *Encarnacion v. Dann*, 80 Fed. App'x 140 (2d Cir. 2003), in which the Second

Circuit, in affirming a grant of summary judgment, held that the plaintiff failed to state an Eighth Amendment injury when he alleged that prison officials failed to protect him by intervening prior to his murdering another inmate.  *See id.* at 141-42 ("Encarnacion suffered no actual injury from the defendants' alleged failure to provide him protection from Roberts, whom he murdered.  All of his alleged injuries stemmed from his affirmative act of murder, rather than any failure on the part of the defendants.").

It is true that here, Johnson died as a result of the fight with Randle.  However, in contrast to the situation contemplated in *Encarnacion*—a deadly fight among inmates that prison officials failed to break up—Randle was allegedly forced to fight *by* the guards.  The serious risk of harm to which Randle was exposed was not of his own making.  Here, instead of merely remaining immobile and indifferent while Randle was exposed to danger, Defendants themselves generated the risk for Randle, by forcing him to fight and threatening to engage in a joint cover-up if he refused.  Moreover, in *Encarnacion*, the Second Circuit reasoned that it was "precluded . . . from providing Encarnacion the result he seeks: essentially, a reversal of his murder conviction, and release from solitary confinement, in addition to monetary damages."  *Id.* at 142.  In contrast, here, a grand jury refused to return an indictment with respect to the death of Johnson, finding "insufficient legal evidence to warrant an Indictment against any person for any crime arising [from the incident]."  (Declaration of Timothy E. DeMasi, Ex. B.)  Accordingly, the circumstances of the instant case could not be further from those in *Encarnacion*.

As for the subjective intent required for an Eighth Amendment claim, Randle alleges that the Guard Defendants forced him to fight Johnson.  Such a forced fight evinces far more than an instance where a prison official only "negligently fail[s] to protect [plaintiff] from another inmate."  *Davidson v. Cannon*, 474 U.S. 344, 347 (1986) (quotations and citation omitted);

*accord Snider*, 188 F.3d at 55.  Instead, such a forced fight serves no penological purpose and reflects indifference to inmate safety, if not malice toward those forced to engage in the illicit violence.  Accordingly, Randle states a cognizable Eighth Amendment claim under a failure to protect theory.

### c.        Conditions of Confinement

As noted above, while "the Constitution does not mandate comfortable prisons," *Rhodes*, 452 U.S. at 349, prisoners are entitled to "basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety."  *Helling*, 509 U.S. at 32 (quoting *DeShaney*, 489 U.S. at 199-200).  Here, there can be no debate that a forced fight orchestrated, condoned, and covered up by a subset of prison officials is an objectively serious violation of inmates' constitutional right to reasonably safe conditions of confinement.  Moreover, the intent evinced by such activity is, at the very least, one of indifference to inmate safety—a fact underscored by the death of Johnson as a result of this particular forced fight.  Thus, Randle states an Eighth Amendment claim under a theory that the perverse "fight club" within Green Haven violated his right to reasonably safe conditions of confinement.

### d.        Conspiracy Claim

Randle also alleges that Benitez, Monzon, Hanaman, and Nelson conspired together to deprive him of his constitutional rights.  As a defense, the Guard Defendants assert that the claim fails as a matter of law in light of the intracorporate conspiracy doctrine.  However, Plaintiff asserts that the intracorporate conspiracy doctrine is inapplicable in cases such as this.  The Court agrees with Plaintiff.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an

unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted).  Even where a Plaintiff adequately alleges these elements, the intracorporate conspiracy doctrine constitutes an exception to the general rule, as "the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other."  *Crews v. Cty. of Nassau*, No. 06 Civ. 2610, 2007 WL 4591325, at *12 (E.D.N.Y. Dec. 27, 2007) (citations omitted).

It is true that the Guard Defendants are all employees of DOCCS.  Nevertheless, the intracorporate conspiracy doctrine contains an important caveat: namely, that the actors involved be engaged in activities *within the scope* of their employment.  *See, e.g.*, *Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 466 (E.D.N.Y. 2010) ("The intracorporate conspiracy doctrine provides that a plaintiff may not assert a cause of action for conspiracy against employees of a single corporate body acting within the scope of their employment.").  Here, there is no fair interpretation of Randle's allegations that suggests that Defendants were acting within the scope of their responsibilities as prison guards when they forced Randle and Johnson to fight each other in the mantrap area.  Accordingly, Randle's conspiracy claim may proceed as a matter of law, so long as he states a claim.

Randle alleges that the Guard Defendants—Benitez, Monzon, Hanaman, and Nelson—entered into an understanding by which if Randle and Johnson refused to fight, Benitez would beat them and the other officers would cover up the situation, reporting that the "inflicted injuries were the result of Mr. Johnson and Mr. Randle fighting each other."  (Compl. at ¶ 143.)  As discussed, such a forced fight objectively reflects a constitutional wrong.  Accordingly, any

agreement to effectuate such a fight or cover-up is an "act in concert to inflict an unconstitutional

injury" as required by the law.

As noted, in order to state a claim of a § 1983 conspiracy, a plaintiff must also allege an

overt act made in furtherance of the unconstitutional goal.  Here, Randle's Complaint alleges not

only that the Guard Defendants had a standing agreement to force inmates to fight in the mantrap

area, but also that "[b]y catcalling, locking up the other inmates in their cells in an effort so no

one would see the forced fight, and filing of false incident reports, each of the Defendant

Officers engaged in overt acts done in furtherance of the conspiracy to violate Mr. Randle's

constitutional rights."  (*Id.* at ¶ 144.)

These allegations are sufficient to raise a plausible inference that the Guard Defendants

engaged in a conspiracy to violate Randle's constitutional rights.  Accordingly, Randle's

conspiracy claim survives Defendants' motion to dismiss.

## 2.   Equal Protection Claim

Randle also alleges that Benitez violated the Equal Protection Clause, by discriminating

against Randle because Randle is African American.  In response, Defendants contend that

Randle's equal protection allegations are conclusory, and are belied by other assertions in his

Complaint.

"The equal protection clause directs state actors to treat similarly situated people alike.

To prove an equal protection violation, claimants must prove purposeful discrimination, directed

at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995)

(citations omitted).  In other words, "[t]o prove a violation of the Equal Protection Clause . . . a

plaintiff must demonstrate that he was treated differently than others similarly situated as a result

of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (citation omitted).

Here, Randle alleges that the forced fights orchestrated by Benitez were racially motivated. Specifically, Randle alleges that (1) Benitez arranged the inmates in his company so that the white inmates were close to the officers' posts, whereas the black inmates were placed further away; (2) white inmates were given superior inmate jobs; (3) "Benitez's efforts to instigate, and then eventually force, the fight between Mr. Randle and Mr. Johnson was motivated by the fact that both Mr. Randle and Mr. Johnson were black"; (4) "Officer Benitez gave other inmates his approval and encouragement to fight Mr. Johnson because those inmates were also black"; (5) "Officer Benitez's efforts in forcing the fight between Mr. Randle and Mr. Johnson were done purposefully for his amusement because both prisoners were black"; and (6) "Officer Benitez's differential treatment of Mr. Randle and other black inmates was motivated by his intent to discriminate on the basis of race and a malicious/bad faith intent to injure Mr. Randle and Mr. Johnson." (Compl. at ¶¶ 147-156.)

These allegations, coupled with the detailed factual background provided by Randle throughout his Complaint, are sufficient to state a plausible claim of an equal protection violation. As the Court noted on the record in its hearing on the original motion to dismiss in January 2012, so long as Randle's claim that he was treated differently from other inmates on the basis of race is plausible, he need not flesh out his allegations with details that can be obtained only through discovery. (*See* Dkt. No. 40.)[3]

---

[3] During the hearing in March 2012, the Court explained to Randle, regarding his equal protection claim:

> But I do want to make it clear to you, I'm not here to give you
> legal advice, but I do want to make it clear to you that if you

Defendants claim that Randle "paints a picture that C.O. Benitez 'encourage[d]' [sic] many inmates to fight—irrespective of race—and would allegedly take action against inmates he did not like or those that failed to first seek his permission before entering a fight."  (Def.'s Mem. at 15.)  This may be so, but these allegations do not undermine Randle's claims that he and Johnson were forced to fight due to their race, nor do the allegations cited by Defendants undermine the core of Randle's equal protection claim: namely, that Benitez treated white inmates preferentially in various respects, including within the context of the illicit fights he allegedly masterminded.  Accordingly, Randle's equal protection claim against Benitez survives the motion to dismiss.

### 3.      Supervisory Liability of Alexander and Ercole

In addition to the Guard Defendants, Randle asserts all claims stemming from the forced fight incident against Alexander and Ercole as well.  As discussed, Alexander was a sergeant at Green Haven and Ercole was the Superintendent of Green Haven during the relevant time period.  Randle alleges that Alexander was personally involved in the unconstitutional behavior of the Guard Defendants, as he was "grossly negligent in managing [those officers]" and "implicitly created and/or allowed an informal policy and/or custom whereby the [violative] actions were allowed to happen throughout Green Haven."  (Compl. at ¶ 126.)  Similarly, Randle alleges that Ercole was on notice concerning Benitez's inappropriate behavior, but failed to discipline him, thus condoning "an informal policy and/or custom whereby the [violative] actions were allowed to happen at Green Haven."  (*Id.* at ¶ 134.)  Defendants contend that Randle has failed to

---

believe that based on all the circumstances that racial motivation was part of it, you can allege it in your complaint and the issue of discovery and evidence comes later in the case. That's how it works.

(Tr., Jan. 5, 2012, at 7:7-14.)

establish that Alexander and Ercole were personally involved in the allegedly unconstitutional conduct.  Instead, Defendants argue, Randle offers nothing more than "bare assertions that Sergeant Alexander and Superintendent Ercole allowed [the Guard Defendants] (or Sergeant Alexander vis-à-vis Superintendent Ercole) to violate Plaintiff's constitutional rights."  (Def.'s Mem. at 21.)

It is axiomatic that individual defendants cannot be liable for § 1983 violations unless they are personally involved with the alleged conduct.  *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991) (citations omitted)).  Notably, "[t]he doctrine of *respondeat superior* does not apply to claims under § 1983; that is, a defendant cannot be held liable merely because he occupied a supervisory position."  *Harrison v. Goord*, No. 07 Civ. 1806 (HB), 2009 WL 1605770, at *9 (S.D.N.Y. June 9, 2009) (citing cases).  Instead, "[t]o maintain such a claim, however, an inmate must adequately 'allege that the official had actual or constructive notice of the unconstitutional practices and demonstrated gross negligence or deliberate indifference by failing to act.'"  *Alston v. Bendheim*, 672 F. Supp. 2d 378, 389-90 (S.D.N.Y. 2009) (quoting *Ifill v. Goord*, No. 03 Civ. 3555, 2005 WL 2126403, at *4 (W.D.N.Y. Sep. 1, 2005)).

Historically, in this Circuit, the personal involvement of a supervisory official may be established when:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or

23

> custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the
> defendant exhibited deliberate indifference to the rights of inmates
> by failing to act on information indicating that unconstitutional
> acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted); *accord Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003).[4]  Although the failure to remedy a wrong is defined as one way in which a supervisor may become personally involved, courts have widely held that "it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."  *Greenwaldt v. Coughlin*, No. 93 Civ. 6551 (LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) (citations omitted); *accord Swindell v. Supple*, No. 02 Civ. 3182 (RWS), 2005 WL 267725, at *11 (S.D.N.Y. Feb. 3, 2005) ("The mere receipt of letters is insufficient to establish personal involvement." (citation omitted)); *Woods v. Goord*, No. 01 Civ. 3255 (SAS), 2002 WL 731691, at *7 (S.D.N.Y. Apr. 23, 2002) ("Receipt of letters or grievances, however, is insufficient to impute personal involvement." (citing cases)); *Watson v. McGinnis*, 964 F. Supp. 127, 130 (S.D.N.Y. 1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability." (citing cases)).

---

[4] The *Hernandez* Court reiterated the *Colon* factors as follows:

> The liability of a supervisor under § 1983 can be shown in one or
> more of the following ways: (1) actual direct participation in the
> constitutional violation, (2) failure to remedy a wrong after being
> informed through a report or appeal, (3) creation of a policy or
> custom that sanctioned conduct amounting to a constitutional
> violation, or allowing such a policy or custom to continue, (4)
> grossly negligent supervision of subordinates who committed a
> violation, or (5) failure to act on information indicating that
> unconstitutional acts were occurring.

341 F.3d at 145.

Randle has alleged sufficient facts to give rise to a plausible inference that Alexander, but not Ercole, was personally involved in the purported constitutional violations.  With respect to Alexander, the Complaint alleges that he participated directly in the conduct by filing a false report to his supervisors in order to "cover up the [Guard Defendants'] actions."  (Compl. at ¶ 127.)  Defendants assert in their Reply that a false report does not rise to the level of a constitutional violation (Defendant's Reply Memorandum of Law, Dkt. No. 98 ("Def.'s Rep."), at 8), but the case they cite is inapposite.  In *Boddie v. Schnieder*, 105 F.3d 857 (2d Cir. 1997), the Second Circuit held that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report."  *Id.* at 862 (citation omitted).  Here, however, Randle does not allege simply that Alexander stated he misbehaved when he had not, or even that Alexander retaliated against him by filing a false report, *but see id.*, but rather, that Alexander played a direct role in covering up an illegal forced fight within the prison.

With respect to Ercole, Randle makes a number of allegations suggesting that the Guard Defendants' behavior was a direct result of supervisory gross negligence that harbored an environment in which this type of forced fight was condoned.  (*See, e.g.*, Compl. at ¶¶ 128, 130-31, 135, 138.)  However, these allegations constitute nothing more than recitations of the applicable standard without supporting factual context.  For example, Randle alleges that Ercole, in his role as superintendent, "failed to train and/or supervise Sergeant Alexander and [the Guard Defendants] in how to properly transport inmates throughout the facility, how to deal with inmate altercations within the facility, the appropriate level of interaction the officers should have with the inmate population, and failed to supervise the officer's interactions with the Green Haven population."  (*Id.* at ¶ 135.)   And while the characteristics of the alleged forced fights— namely that many guards participated, they took place in an organized manner, and occurred in a

25

particular area of the Green Haven facility—suggest that the Guard Defendants' alleged antics may have been well known among certain subsets of guards at Green Haven, given the alleged cover-up of the incident between Johnson and Randle, it seems implausible that someone in Superintendent Ercole's position would have been aware of the forced-fight practice. Accordingly, on both a failure to train theory, and the theory that Ercole was grossly negligent in permitting the purported practice to continue on his watch, Randle's claims against Ercole fail to survive Defendants' motion to dismiss.  And while it is true that Randle does allege that Ercole ignored inmate grievances and complaints—as discussed, such behavior is non-actionable in this context.

### 4.     Qualified Immunity

Defendants raise qualified immunity as a defense to Randle's allegations relating to the forced fight.  Defendants contend that their conduct did not violate clearly established law. There can be no doubt that inmates have a clearly established right to remain incarcerated in reasonably safe conditions.  *See, e.g.*, *Williams v. Carbello*, 666 F. Supp. 2d 373, 378 (S.D.N.Y. 2009) ("To satisfy the objective prong, a prisoner must demonstrate that he has been denied basic human needs, such as food, clothing, shelter, medical care, and reasonable safety, or has been exposed to conditions that pose an unreasonable risk of serious damage to his future health." (citation omitted)).   In support of their position, Defendants again cite the Second Circuit's unpublished decision in *Encarnacion*, arguing that their actions were reasonable in observing, but not stopping, the fight between Randle and Johnson, because Randle wound up murdering Johnson in the course of this altercation.  (Def.'s Mem. at 12-13.)  These assertions ignore the central allegation of Randle's TAC: namely, that Defendants instituted an unofficial policy of forcing certain inmates to fight each other.

Of course, even where officers violate a clearly established constitutional right, they may nevertheless be entitled to qualified immunity if "it was 'objectively reasonable . . . to believe that [their] actions were lawful at the time of the challenged act.'"  *Cerrone*, 246 F.3d at 199 (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (internal quotations omitted)).  Here, there can be no serious contention on the part of Defendants that it is objectively reasonable to threaten inmates until they agree to fight each other in front of prison officials.   In sum, not only did Defendants' behavior—as alleged in the Complaint—violate Randle's clearly established constitutional rights, but it was also objectively unreasonable.  Accordingly, Defendants are not entitled to qualified immunity.

### B.    Allegations Relating to the GTP and Confinement in SHU Conditions

The Complaint also asserts various allegations against the Mental Health Defendants stemming from his extended confinement in the GTP and in SHU-like conditions.

### 1.    Eighth Amendment Inadequate Medical Care Claim

Randle alleges that the Mental Health Defendants failed to treat him for his serious mental health conditions, which constituted deliberate indifference to his medical needs.

As discussed, "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment . . . whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Estelle*, 429 U.S. at 104-05 (quotations and footnotes omitted).

"[T]he alleged deprivation of adequate medical care must be 'sufficiently serious.'" *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (quoting *Farmer*, 511 U.S. at 834)

(internal quotations omitted).  In this context, to state a claim, the prisoner must allege that (1) he was actually deprived of adequate medical care, and (2) the inadequacy was sufficiently serious, requiring an examination of "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280 (citation omitted).  In determining the seriousness of a medical condition, courts look to certain factors, including: (1) "whether 'a reasonable doctor or patient would find [it] important and worthy of comment'"; (2) "whether the condition 'significantly affects an individual's daily activities'"; (3) "and whether it causes 'chronic and substantial pain.'"  *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

Additionally, in keeping with traditional Eighth Amendment analysis, where the objective prong is satisfied, the putatively offending officers must also evince subjective intent to commit the wrong, which need not rise to the level of malice, but may be satisfied through deliberate indifference.  *Id.* ("In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health.  Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law.  This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." (citations omitted)).  In other words, "[t]he reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result.  Rather, proof of awareness of a substantial risk of the harm suffices."  *Id.* (citation omitted).  Notably, "recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent."  *Id.* (citations omitted).

Randle alleges that he has a history of a serious mental illness, adding that his symptoms increased during the wake of the forced fight with Johnson.  The Complaint includes allegations that Randle "experienced flashbacks of the fight and heard Mr. Johnson's voice in his head." (Compl. at ¶ 92.)  Additionally, Randle attempted suicide on three occasions, two of which required his hospitalization.  (*Id.* at ¶¶ 95-96.)  After these suicide attempts, Randle was placed in the GTP at Clinton Correctional; and despite the fact that the GTP is intended to be a short-term program, Randle remained there inexplicably for two years, even though he participated willingly in therapy.  According to Randle, his mental health seriously deteriorated due to his extended stay in GTP, and because he was kept in SHU-like conditions with other SHU prisoners.  (*Id.* at ¶¶ 97-102.)

Specifically, Randle alleges that the Mental Health Defendants evinced deliberate indifference to his medical needs, as they recklessly disregarded the risk Randle faced as a result of the SHU confinement.  Randle claims that he even warned his therapist, Marinelli, that "he did not feel safe with himself."  (*Id.* at ¶ 186.)  Randle was also confined to SHU despite the recommendation that he be placed in a less-restrictive location, and despite his acceptance into that program, which, according to Randle, constitutes nothing less than conscious disregard for the state of his mental health.  (*Id.* at ¶ 191.)

Randle's allegations, if true, state objectively serious deprivations: namely, that his mental health issues were left untreated to the point where he heard voices, attempted suicide, contemplated violent acts, and was severely traumatized by the forced fight with Johnson.  Such conditions would be perceived by a reasonable physician as "important and worthy of comment or treatment," and these mental health issues would "significantly affect[] daily activities."  *See*

*Butler v. Suffolk Cty. Correctional Facility Med. Ctr.*, No. 11 Civ. 1464, 2013 WL 1193065, at

*6 (E.D.N.Y. Mar. 22, 2013) (quotations and citation omitted).

Defendants argue that Randle's Eighth Amendment claim based on inadequate medical

care, in essence, constitutes nothing more than a non-actionable disagreement with the treatment

recommended for him by the DOCCS mental health professionals in charge of his care.  (Def.'s

Mem. at 28.)  Indeed, "[a]n inmate's disagreement with his treatment or a difference of opinion

over the type or course of treatment [does] not support a claim of cruel and unusual punishment."

*Alston v. Bendheim*, 672 F. Supp. 2d 378, 385 (S.D.N.Y. 2009) (citation omitted).  Accordingly,

"disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of

treatment, or the need for specialists or the timing of their intervention, are not adequate grounds

for a Section 1983 claim.  These issues implicate medical judgments and, at worst, negligence

amounting to medical malpractice, but not the Eighth Amendment."  *Sonds v. St. Barnabas*

*Hosp. Correctional Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

Defendants' argument has some logical appeal; Randle disagreed with the Mental Health

Defendants' decision to keep him in the GTP for an extended period of time, which was a

discretionary treatment election, well within the purview of the mental health professionals at the

prison.  However, a plausible inference from Randle's Complaint, where all his allegations are

taken as true, is that the Mental Health Defendants were acutely aware of Randle's deteriorating

mental state and refused his transfer to the less restrictive program to which he had been

accepted for reasons unrelated to his well-being and health, evincing deliberate indifference to

those needs.  What Randle alleges is not a disagreement with the treatment plan of the Mental

Health Defendants, but rather, indifference to the deleterious effect that his extended

confinement in SHU-like conditions within the GTP had on his preexisting mental state.  Here,

30

Randle alleges not the "choice of a certain course of treatment," but rather, the "absence of help."  *Cf. Hathaway v. Coughlin*, 37 F.3d 63, 70 (2d Cir. 1994) ("We do not sit as a medical board of review.  Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, or evidences mere disagreement with considered medical judgment, we will not second guess the doctors." (quoting *Sires v. Berman*, 834 F.2d 9, 13 (1st Cir. 1987) (quotations omitted)).

Accordingly, Randle's Complaint states an Eighth Amendment claim for inadequate medical care.

### 2.      First Amendment Retaliation Claim

In tandem with his inadequate medical care claim, Randle asserts a First Amendment retaliation claim against the Mental Health Defendants.  Defendants argue that Randle "fails to plead anything but a speculative and conclusory allegation that there is a nexus between his protected activities . . . and the transfer denials from the Clinton GTP to another, less-restrictive mental health program."  (Def.'s Mem. at 31.)  Moreover, Defendants contend that Randle has failed to plead any facts which show that "adverse action" was taken against him, as required for a retaliation claim.  (*Id.*)

"To succeed on a First Amendment retaliation claim, a party must show: '(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.'"  *Mesa v. City of New York*, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *23 (S.D.N.Y. Jan. 3, 2013) (quoting *Curley v. Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)).  While courts indeed "recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims

of retaliation may be fabricated," *Colon*, 58 F.3d at 872 (citation omitted), "a complaint that 'alleges facts giving rise to a colorable suspicion of retaliation . . . will support at least documentary discovery.'" *Andino v. Fischer*, 698 F. Supp. 2d 362, 382 (S.D.N.Y. 2010) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

Randle alleges that he was kept in the GTP by the Mental Health Defendants for two years, despite the fact that this program was to be short-term—approximately 90 days—as retaliation for speaking up multiple times about the forced fight. Specifically, Randle alleges he sent Van Buren a letter in August 2010, the seventh time he had sent such a letter, stating that he had already been in the GTP for over a year and was being discriminated against. In July 2010, Randle was "referred and accepted to Great Meadow BHU, but then denied by DOCS for transfer after [he] had been approved." (Compl. at ¶ 103.) Randle alleges that he was told by members of the New York Office of Mental Health ("OMU") that "DOCS administration officials refused every transfer referral that OMU staff submitted on Mr. Randle's behalf." (*Id.* at ¶ 104.) Randle also alleges that his family called on his behalf, after he had explained the situation to them, and, as a result of those calls, he was "inappropriately transferred to other GTP SHU-like facilities." (*Id.* at ¶ 106.)

Here, Randle has plausibly alleged that the Mental Health Defendants retaliated against him for speaking out about the forced fight. He specifically alleges that he was approved for transfer to a less restrictive program, but was denied that transfer due to the fact that he had filed grievances and had repeatedly spoken out concerning the forced fight. Moreover, he alleges that he was transferred to restrictive, SHU-like conditions after relaying these issues to his family, who called repeatedly on his behalf seeking answers, in another retaliatory action by the Mental Health Defendants.

### 3.      Supervisory Liability of Rameriz-Romero

Specifically with respect to Ramirez-Romero, Defendants contend that the Complaint fails to adequately allege supervisory liability against Ramirez-Romero, arguing that "nowhere in the complaint does Plaintiff claim that D. Ramirez-Romero actually supervised any of the 'DOCS Mental Health Defendants.'"  (Def.'s Mem. at 33.)

As discussed, one of the *Colon* factors sufficient to allege supervisory liability is "actual direct participation in the constitutional violation."  *Hernandez*, 341 F.3d at 145 (citing *Colon*, 58 F.3d at 873).  Any policy or failure to train aside, Randle alleges that Ramirez-Romero, as Director of Correctional Mental Health Services, played a direct role in keeping him confined in the GTP and in SHU conditions far longer than appropriate, and in reckless disregard to his serious mental health needs.  (*See, e.g.*, Compl. at ¶¶ 107-109.)  It is true that Randle's allegations concerning his transfers lack specificity as to the exact chain of command in terms of the mechanisms of prisoner transfer within the various mental health programs.  However, such information is properly the subject of the discovery process and does not reveal a defect in the Complaint.  Randle has alleged sufficient facts from which the Court can plausibly infer that the Mental Health Defendants, and Director Ramirez-Romero, were involved in his inappropriately long stay in the GTP and subjugation to SHU-like conditions.

Accordingly, Randle's claims against Ramirez-Romero survive the motion to dismiss.

### 4.      Defendants' Failure to Exhaust Argument

As a defense to all claims against the Mental Health Defendants, Ramirez-Romero, and Marinelli, Defendants argue that Randle has failed to exhaust his administrative remedies, as required by the Prisoner Litigation Reform Act of 1995 ("the PLRA").  Randle counters by

arguing that failure to exhaust, as an affirmative defense, is not a proper subject for a motion to dismiss.

"The Prison Litigation Reform Act ("PLRA") provides that '[n]o action shall be brought with respect to prison conditions under [§ 1983] until such administrative remedies as are available are exhausted.'" *Mason v. Sassi*, No. 05 Civ. 8800 (WHP), 2007 WL 672095, at *3 (S.D.N.Y. Mar. 6, 2007) (quoting 42 U.S.C. § 1997e) (citations omitted).  It thus follows that, "even if an inmate files a valid grievance, all appeals must be exhausted in order to bring a suit in federal court." *Id.* (citing cases).  While "nonexhaustion should be resolved as early as possible by the court," *McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003) (citations omitted), "nonexhaustion is an affirmative defense, and therefore defendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity." *Id.* at 248 (citing cases); *accord Jones v. Bock*, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.  We understand the reasons behind the decisions of some lower courts to impose a pleading requirement on plaintiffs in this context, but that effort cannot fairly be viewed as an interpretation of the PLRA.").

The only circumstance in which it is appropriate to dismiss a complaint on nonexhaustion grounds is when it is apparent from the face of the complaint that the plaintiff failed to exhaust his administrative remedies.   *See Roland v. Wenz*, No. 9:10 Civ. 0089, 2010 WL 2834828, at *4 (N.D.N.Y. May 24, 2010) *report and recommendation adopted*, No. 9:10 Civ. 89, 2010 WL 2817485 (N.D.N.Y. July 16, 2010) ("An inmate may, however, gratuitously address exhaustion in a complaint in a such a way as to destine his or her claims to certain dismissal; '[i]f a prisoner chooses to plead facts regarding exhaustion, and those facts plausibly suggest that he failed to

34

exhaust available administrative remedies, then his complaint may be dismissed for failure to state a claim.'" (quoting *Wheeler v. Pataki*, No. 9:07 Civ. 0892, 2009 WL 674152, at *10 (N.D.N.Y. Mar.11, 2009)).

Moreover, even when a prisoner fails to exhaust administrative remedies before filing a complaint in federal court, the failure may be excused in certain circumstances.  *See generally Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004).  Specifically, a prisoner's failure to exhaust his administrative remedies before filing a complaint may be excused if (1) "administrative remedies were in fact available "; (2) the defendants "forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it", or "whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense"; or (3) special circumstances "have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements."[5]  *Id.* at 686 (quotations and citations omitted).

Here, first and foremost, Defendants did not properly move to dismiss this claim on the grounds of exhaustion in their initial memorandum, as they simply asserted that "according to

---

[5] The Court has previously held that all three of the *Hemphill* factors survive the Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 81 (2006).  *See Stevens v. City of New York*, No. 12 Civ.1918 (JPO), 2012 WL 4948051, at *6 (S.D.N.Y. Oct. 12, 2012) ("Thus, a reading of *Woodford* that called *Hemphill* into question would fail to appreciate the significance of the Court's reliance on administrative and habeas corpus doctrine, overextend its policy reasoning, and undervalue its sensitivity to circumstances where malfeasance by prison administrators effectively destroys any chance of legal remedy. For these reasons, Justice Breyer's view that *Woodford* is compatible with precedent like *Hemphill* reflects not merely Justice Breyer's view, but the better reading of the Court's opinion in *Woodford*.").  In *Woodford*, the Court held that a prisoner may not satisfy the exhaustion requirement of the PLRA through the filing of a procedurally defective grievance, but rather, that the PLRA requires "proper exhaustion." *Woodford*, 548 U.S. at 90; *see also Amador v. Andrews*, 655 F.3d 89, 102 (2d Cir. 2011) (noting the potential conflict within factors (2) and (3) of *Hemphill* and the Supreme Court's decision in *Woodford*, but declining to decide the conflict).

DOCCS' records," Randle "failed to exhaust his retaliation claim against D. Ramirez-Romero

and the DOCS Mental Health program," as well as his deliberate indifference claim against those

defendants.  At the motion to dismiss stage, the Court will not consider Defendants' exhibits

showing that their database does not reflect a grievance filed by Randle, as this result is not one

apparent from the face of the Complaint.  *See Jones*, 549 U.S. at 215 ("Whether a particular

ground for opposing a claim may be the basis for dismissal for failure to state a claim depends on

whether the allegations in the complaint suffice to establish that ground . . . ." (citing cases)).

       Additionally, if anything, Randle's Complaint plausibly suggests that any absence of a

grievance was caused by threats made to him as he attempted to grieve his constitutional injuries

in the procedurally proper way, which suggests that any putative nonexhaustion was either due to

constructive unavailability, "[D]efendants' own actions inhibiting the inmate's exhaustion," or

"special circumstances."  *Hemphill*,  380 F.3d at 686; (*see* Compl. at ¶ 90 ("[A] sergeant that was

investigating the grievances that Mr. Randle had filed against the officers came to Mr. Randle

and told him 'your grieving about the C/O's stops right here and right now.'  Mr. Randle wrote

many letters regarding the grievance process, but following the sergeant's threat to him, he felt

threatened and confused about the process."); *id.* at ¶¶ 102, 159 (noting that Randle sought

various outlets to assert his grievance against the Mental Health Defendants and Ramirez-

Romero, suggesting that the traditional channels were not available to him, given the retaliation

against him and his particularized treatment)); *see also Stevens*, 2012 WL 4948051, at *4 ("[T]he

Court must account for the possibility that Plaintiff's experience with the grievance process falls

within an availability, estoppel, or special circumstances exception.").  Defendants, in their

Reply, counter by noting that Randle was able to exhaust several grievances while in the GTP,

which thus shows that the grievance opportunity *was* available to him while housed in the GTP,

but again, the face of Randle's Complaint does not suggest that he failed to grieve for an inexcusable reason.

In any event, Defendants are free to present their documentary evidence of nonexhaustion during the next stage of litigation; but Randle's claims of inadequate medical care and retaliation survive Defendants' motion to dismiss.

### C.    Defendants' Objection to Venue

Defendants also object to venue in the Southern District of New York, arguing that venue is proper in the Northern District of New York.  In the alternative, Defendants request that the Court transfer Randle's claims against Ramirez-Romero, Marinelli, and the Mental Health Defendants to the Northern District, as those defendants reside there.

Pursuant to 28 U.S.C. § 1391(b), a plaintiff may bring a civil action in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Additionally, even where venue is proper, a court, "[f]or the convenience of parties and witnesses, in the interest of justice," may nevertheless transfer a case "to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  "In deciding motions to transfer venue under § 1404(a), courts inquire, first, 'whether the action could have been brought in the transferee district and, if yes, whether transfer would be an appropriate exercise of the Court's discretion.'"  *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, No. 12 Civ. 5297 (PAE), 2013 WL 788054, at *6

(S.D.N.Y. Mar. 4, 2013) (quoting *Robertson v. Cartinhour*, No. 10 Civ. 8442 (LTS)(HBP), 2011

WL 5175597, at *3 (S.D.N.Y. Oct. 28, 2011)).  In examining whether transfer is appropriate,

courts balance a number of factors:

> (1) the convenience of the witnesses; (2) the convenience of the
> parties; (3) the location of relevant documents and the relative ease
> of access to sources of proof; (4) the locus of operative facts; (5)
> the availability of process to compel the attendance of unwilling
> witnesses; (6) the relative means of the parties; (7) the forum's
> familiarity with the governing law; (8) the weight accorded the
> plaintiff's choice of forum; and (9) trial efficiency and the interests
> of justice.

*Id.* (citations omitted).  Of these factors, the convenience of witnesses is traditionally viewed as

the most important.  *See Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d

513, 520 (2d Cir. 1989) ("[T]he convenience of witnesses is an expressly stated consideration in

section 1404(a), and . . . is '[p]robably the most important factor' in deciding an application

under that section." (quoting 15 C. Wright A. Miller & E. Cooper § 3851, at 415 (1986)).

Contrary to Defendants' contentions, venue is proper in the Southern District of New

York.  Despite the fact that Ramirez-Romero, Marinelli, and the Mental Health Defendants

reside in the Northern District, the Guard Defendants and Ercole and Alexander all reside in the

Southern District.  And § 1391 permits a plaintiff to bring an action in a judicial district in which

*any* defendant resides, so long as all defendants are residents of the State in which the district is

located—here, New York.  Moreover, Defendants cannot seriously contend that a "substantial

part" of the events giving rise to the claim did not occur in the Southern District, as the forced

fight—from which all of Randle's claims in some form or another derive—occurred at Green

Haven, in the Southern District.  Accordingly, venue is proper in the Southern District of New

York.

As for Defendants' second request, to sever Randle's claims against Marinelli, Ramirez-Romero, and the Mental Health Defendants and transfer them to the Northern District, the factors weigh in favor of retaining, rather than transferring, jurisdiction as to these claims.  With respect to the severance of Randle's claims, while courts may, in their discretion, "sever and transfer a claim against one or more defendants where the administration of justice would be materially advanced thereby," *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279, 288 (S.D.N.Y. 2000) (internal quotations and footnote omitted), before doing so they must examine several factors: namely,

> '(1) whether the issues sought to be tried separately are significantly different from one another, (2) whether the separable issues require the testimony of different witnesses and different documentary proof, (3) whether the party opposing the severance will be prejudiced if it is granted and (4) whether the party requesting the severance will be prejudiced if it is not granted.'

*Id.* (quoting *German By German v. Fed. Home Mortgage Corp.*, 896 F. Supp. 1385, 1400 (S.D.N.Y. 1995) (citation omitted)).  Here, the issues to be tried are separate, but closely related. While Randle's claims of retaliation and inadequate medical care deal with a separate set of defendants, and a separate facility, all his claims stem from the initial allegation of the forced fight.  Further, Randle would be prejudiced if forced to litigate his claims in separate forums, presenting them as discrete instances, when, in reality, they are interrelated.  In contrast, those requesting transfer here may be inconvenienced by litigation in the Southern District, but they will not be prejudiced by it.

Moreover, even if the factors weighed in favor of severance, transfer would nevertheless remain improper in light of convenience, the locus of operative facts, trial efficiency, and the interests of justice.  Plaintiff is correct in noting that "Defendants' argument that the Mental

Health Defendants will be inconvenienced if this action is not transferred fails, because regardless of where this action is venued at least some of the defendants will be inconvenienced."   (Pl.'s Opp. at 37.)  At their core, each of Plaintiff's claims derives from a forced fight that occurred at Green Haven, within the Southern District of New York. Accordingly, Defendant's request to transfer venue or, alternatively, to sever Randle's claims against Marinelli, Ramirez-Romero, and the Mental Health Defendants is denied.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Defendants' motion is GRANTED with respect to Defendant Ercole and DENIED as to all other Defendants.  The Clerk of Court is directed to close the motion at docket entry number 86.


SO ORDERED.


Dated: New York, New York
       May 30, 2013


_____
J. PAUL OETKEN
United States District Judge

40