UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
  EL'REKO D'WAYNE RANDLE,           :

                                      :

                      Plaintiff,    :

                                      :          10-CV-9235 (JPO)

         -v -                 :

                                      :        OPINION AND ORDER

  SERGEANT TRACY ALEXANDER *et al*.,  :

                                      :

                     Defendants.   :
------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      Plaintiff El'Reko D'Wayne Randle filed this action under 42 U.S.C. § 1983.  Randle

alleges that prison officials violated the Eighth Amendment by forcing him to fight and

ultimately kill another prisoner while they watched.  He also alleges Eighth Amendment

violations related to a two-year period of solitary confinement.  In three separate motions,

Defendants move for summary judgment.  (Dkt. Nos. 239-41.)  For the reasons that follow, the

motions are denied.

## I.    Factual Background

      There are a number of Defendants in this action.  Dennis Benitez, William Monzon,

Harold Hanaman, and Kyle Nelson (collectively, the "Guard Defendants") were correctional

officers ("C.O.s") at Green Haven Correctional Facility ("Green Haven") in January 2009.

Tracy Alexander was a sergeant at Green Haven at that time.  John Marinelli is a psychologist

who treated Randle at Upstate Correctional Facility ("Upstate").

      Steven Kafka and Sean Duncan are investigators in the New York State Department of

Corrections and Community Supervision ("DOCCS") Inspector General's Office (the "IG's

Office").[1]  During relevant periods, Donald Selsky and Kenneth Decker worked for the DOCCS

Assistant Commissioner, and Ryan McNulty, Melissa Collins, Mitchel Lake, and Charles

Gordon worked for the DOCCS Bureau of Mental Health Services.  The parties refer to

Defendants named in this paragraph as the "Mental Health Defendants."  (Dkt. No. 60 ¶ 28; Dkt.

No. 99 at 2; Dkt. No. 241 ("Def.'s Mot.") at 1 n.3.)

Randle is currently incarcerated at Sullivan Correctional Facility.[2]  This case arises out of

events that occurred when he was imprisoned at Green Haven, Upstate, and Clinton Correctional

Facility ("Clinton") between 2009 and 2011.

### A.    The Green Haven Fights

This dispute centers on two fights at Green Haven between Randle and a prisoner named

Melvin Johnson (the "Green Haven Fights").  (Dkt. No. 293 ¶ 1.)  According to Randle, in early

January 2009, C.O. Benitez approached him, told him he had the "option" to fight Johnson, and

said he would "cover-up the fact that the officers forced the[] [prisoners] to fight."  (*Id.* ¶ 30.)

Several days later, C.O. Benitez instigated a fight by telling Randle that Johnson had accused

him of violating prison rules.  (*Id.* at ¶¶ 3, 30.)  Defendants dispute both that C.O. Benitez

threatened Randle and that he instigated the fight, but agree that the prisoners began fighting on

January 9, 2009, after correctional officers released Randle from his cell.  (*Id.* ¶ 5.)

The first fight took place in Johnson's cell.  Defendants allege that Randle hit Johnson

approximately twenty times, aiming for his head.  (Def.'s Mot. at 6.)  Randle does not recall how

---

[1] The DOCCS Inspector General's Office was renamed the Office of Special Investigation in
2014.  (*See* Dkt. No. 241 at 1 n.2.)  The parties refer to the office by its prior name. For clarity,
the Court does so as well.

[2] The Court takes judicial notice of this fact based upon a search of the DOCCS Inmate
Population Information Search.  *See* http://nysdoccslookup.doccs.ny.gov/ (last viewed March 14,
2016).

many times he struck Johnson, but "doubt[s] it was more than five times." (Dkt. No. 293 ¶ 5.)
The parties agree that C.O. Monzon stopped the fight "with verbal commands" and then escorted
Randle to the "mantrap," a room with locked doors on two sides. (*Id.* ¶ 6; Def.'s Mot. at 7.)

The parties offer conflicting descriptions of events inside the mantrap. Randle avers that
he and Johnson were taken to the mantrap together, where C.O. Benitez told them to "finish what
y'all started." (Dkt. No. 293 ¶ 7, 32.) He states that C.O.s Hanaman and Nelson were in a room
adjacent to the mantrap called the "Bubble" when he entered, and that shortly thereafter, C.O.
Nelson left "without taking any action to ensure the inmates had been secured." (Dkt. No. 276
¶ 8; Dkt. No. 293 ¶ 6, 38.) The prisoners then began to fight for a second time. (Dkt. No. 293
¶40.) Randle avers that "multiple voices cheered from inside the Bubble after he struck
Johnson," and that "none of the officers attempted to stop the fight." (*Id.* ¶ 8.) At some point,
Johnson fell to the ground and did not get up. Sergeant Alexander then arrived at the scene and,
according to Randle's sworn testimony, said "why is this piece of shit laying here on my floor?"
(*Id.* ¶ 42.) Johnson later died of his injuries.

Defendants state that C.O. Hanaman was the only officer in the Bubble when C.O.
Monzon brought Randle into the mantrap. (*Id.* ¶ 6.) They aver that C.O. Nelson was "securing
the A-4 Gallery" during the second fight and did not arrive at the mantrap until after the fight
concluded. (*Id.* ¶ 8; Def.'s Mot. at 8.) Their account of the facts does not include cheering by
officers during the fight, nor does it contain Sergeant Alexander's statement about Johnson.
Defendants assert that the second fight lasted "about fifteen seconds." (Dkt. No. 293 ¶ 8.)

Sergeant Alexander and the Guard Defendants each wrote incident reports after the fight.
According to Randle, the Guard Defendants conversed while writing their "one-to-two page

reports" over the course of five hours, and Sergeant Alexander "referred to the[] [Guard Defendants'] reports when he wrote his own."  (*Id.* ¶¶ 44-46.)

After the fight, Randle was sentenced to ten years in the Special Housing Unit ("SHU"), a form of solitary confinement.  (*Id.* ¶ 54; Def.'s Mot. at 8; Dkt. No. 278-3 at 160 ("Benitez Dep.") (describing SHU custody as equivalent to solitary confinement).)  He was transferred to the SHU at Upstate on February 12, 2009.  (Def.'s Mot. at 8.)

### B.   SHU Confinement

Randle was held in the SHU at Upstate from "approximately February 12, 2009 to April 16, 2009."  (Dkt No. 293 ¶ 10.)  During that period, he received mental health treatment from Defendant Marinelli.  (Dkt. No. 293 ¶ 10.)  The parties dispute how many times Randle met with Marinelli, how thoroughly Marinelli reviewed Randle's records, and what Randle's "OMH Mental Health Level" was during his confinement at Upstate.  Randle asserts that he met with Marinelli three times; Defendants state that Marinelli met with Randle "at least seven times." (*Id.* ¶ 12, 18.)  Randle asserts that Marinelli knew that he had attempted suicide multiple times, but "brushed [him] off" when he said "he didn't feel safe being in the cell by himself."  (*Id.* ¶12.) Defendants state that Randle "denied suicidal thinking" and was "consistently assessed as a low suicide risk" by Marinelli and other prison staff.  (*Id.* ¶¶ 12, 17.)

On April 16, 2009, Randle "cut himself seriously enough that he required sutures at an outside hospital."  (*Id.* ¶ 21.)  After being released from the hospital, he was transferred to a "mental health crisis unit" at Clinton.  (*Id.*)  Shortly thereafter, Randle was sent to Clinton's "Group Therapy Program" ("GTP"), a "SHU-based intervention" in which "seriously mentally ill inmates are housed in SHU blocks."  (*Id.* ¶¶ 21, 92.)  Randle stayed in the Clinton SHU until August 2010, when he was sent to the GTP at Elmira Correctional Facility ("Elmira").  (*Id.*

¶ 135.)  He was transferred to a hospital on October 19, 2010 after a suicide attempt, and returned to Elmira thereafter.  (*Id.* ¶ 137.)  Randle was then sent to the GTP at Wende Correctional Facility.  (*Id.* ¶ 140.)  He was released from the Wende GTP, and thus SHU custody, on June 20, 2011, when he was sent to Five Points Correctional Facility.  (*Id.*)

Randle alleges that the Mental Health Defendants denied multiple requests to transfer him to a less restrictive mental health program during his two year period of confinement in the GTP.  (*Id.* ¶ 22.)  The parties agree that the Mental Health Defendants reviewed and denied Randle's transfer requests (*Id.* ¶ 24), but dispute whether the denials were warranted.  Randle asserts that the GTP is intended to be "a time-limited intervention with a goal of stabilizing inmates."  (*Id.* ¶ 25.)  He avers that employees in the Office of Mental Health, including members of his "treatment team," recommended him for transfer from the GTP multiple times, but that each time DOCCS employees denied, canceled, or failed to implement the recommendations "to punish [him] for the outcome of the [Green Haven Fights]."  (*Id.* ¶¶ 103, 106, 109, 112, 114, 116, 123; *see also* Dkt. No. 291 ("Pl.'s Opp.") at 41.)  The Mental Health Defendants assert that the GTP was appropriate for Randle and that employees in the various programs provided Randle with adequate care.  (*Id.* ¶ 24.)

### C.  Grievances

On February 2, 2009, Randle filed a grievance alleging that C.O.s Benitez and Monzon had encouraged the Green Haven Fights and fabricated a misbehavior report about their role in the incident.  (*Id.* ¶ 54; Def.'s Mem. at 19; Dkt. No. 272-2; Dkt. No. 292-21.)  Green Haven's Superintendent decided to refer the grievance to the IG's Office.  (Dkt. No. 293 ¶ 55.)  Randle appealed that decision to the Central Office Review Committee ("CORC"), which upheld the Superintendent's decision.  (Dkt. No. 292-22; Dkt. No. 293 ¶ 55.)  After an investigation, the

IG's Office determined that the allegation that C.O. Benitez "failed to follow safety protocols" was "substantiated." (Dkt. No. 292-23 at 3-4.)

On August 4, 2009, during his incarceration at the Clinton GTP, Randle wrote a letter to Diane Van Buren, Assistant Commissioner in DOCCS Central Office. (Dkt. No. 292-29; Dkt. No. 293 ¶ 65.) The letter requested that Van Buren "please help me get to a program where the CO's don't harass and the workers are really sincere with helping guys like me." (Dkt. No. 292-29.) Van Buren forwarded the letter to the Superintendent at Clinton and asked him to investigate Randle's concerns. (Dkt. No. 292-31.)

On May 11, 2010, Randle filed a formal grievance from the Clinton GTP. (Dkt. No. 292-27.) The grievance challenged Randle's ongoing incarceration in the SHU and requested that his "SHU time be depleted." (*Id.*) On May 28, 2010, Clinton's Superintendent informed Randle that his request for "reconsideration of his SHU time" was "non-grievable pursuant to Directive #4040 401.3(e)(2)." (*Id.* at 8.) He directed Randle to "address this issue by writing to the Director of SHU in central office." (*Id.*) Randle appealed to the CORC, which upheld the Superintendent's determination in an opinion issued on August 11, 2010. (*Id.* at 2.) Two days later, Randle wrote another letter to Van Buren. (Dkt. No. 292-32.) It stated:

> [T]he purpose of this letter to your office is because I have been in this G.T.P Program since early April 2009 . . . . the average inmate [who] participates in this G.T.P. only stays approximately 90 days and move[s] on . . . . I'm suppose[d] to progress to the next level or next program but for some reason(s) that's unknown to me I'm stagnated in this G.T.P. which is in a SHU environment . . . .

(Dkt. No. 292-32 at 2-3.)

### D.    Staff Sanctions

Both the IG's Office and the New York State Police investigated the Green Haven Fights. (Dkt. No. 279 ¶ 29.) In October 2009, C.O.s Benitez and Monzon received notices of discipline

dismissing them from service for "fail[ure] to properly safeguard inmates under [their] supervision" in connection with the January 9, 2009 fight.  (Dkt. Nos. 278-5, 278-6.)  Both C.O.s pursued arbitration after receiving the notices.  On April 15, 2010, an arbitrator determined that C.O. Benitez was "guilty of failing to properly provide for an inmate under his direction."  (Dkt. No. 278-7 at 44.)  C.O. Benitez was thereafter reinstated to his position at Green Haven.  (Dkt. No. 278-3 at 149-51.)  After an unpaid suspension of approximately seven months, C.O. Monzon also returned to work.  (Dkt. No. 278-2 at 147-55.)

## II.    Procedural History

Randle filed this case *pro se* on December 1, 2010, and on March 22, 2011, Magistrate Judge Fox granted his application for appointment of pro bono counsel.  (Dkt. Nos. 1, 8.)  Randle thereafter filed the operative Complaint, which Defendants moved to dismiss.  (Dkt. Nos. 60, 86-88.)  On May 30, 2013, the Court granted the motion to dismiss in part and denied it in part. (Dkt. No. 99.)

In June 2015, Randle withdrew two of his claims and dismissed all claims against seven of the original Defendants.  (Dkt. No. 230.)  As a result, three claims and fourteen Defendants remain.  In three separate motions, Defendants moved for summary judgment on August 10, 2015.  (Dkt. Nos. 239-241.)

## III.    Discussion

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational juror could find in favor of the non-moving party.  *Ricci v. DeStefano*, 557 U.S.

557, 586 (2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In assessing a motion for summary judgment, the court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted). "It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) (citation omitted).

Randle asserts three claims under 42 U.S.C. § 1983. He asserts two claims—an Eighth Amendment claim for cruel and unusual punishment and a § 1983 conspiracy claim—against the Guard Defendants and Sergeant Alexander. He asserts an Eighth Amendment deliberate indifference claim against the Mental Health Defendants and Defendant Marinelli. Defendants move for summary judgment on each of these claims.

### A.    Exhaustion

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under Section 1983 . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Nonexhaustion is an affirmative defense on which defendants bear the burden of proof. *Randle v. Alexander*, 960 F. Supp. 2d 457, 483 (S.D.N.Y. 2013) (Oetken, J.) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)).

Under Second Circuit precedent, a prisoner's failure to exhaust can be excused where: (1) administrative remedies were not in fact available; (2) the defendant forfeits the defense of nonexhaustion or engages in conduct that estops the defendant from asserting the defense; or (3) special circumstances "have been plausibly alleged that justify the prisoner's failure to comply

with administrative procedural requirements." *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004) (citations and internal quotation marks omitted); *see also Messa v. Goord*, 652 F.3d 305, 309 (2d. Cir. 2011) (reciting the *Hemphill* factors).[3]  "The most commonly recognized special circumstances are where the inmate reasonably misunderstood the relevant grievance procedures." *Black v. Fischer*, No. 12-CV-2341, 2013 WL 1314940, at *7 (S.D.N.Y. Mar. 28, 2013) (citations omitted).  Whether the third *Hemphill* exception applies is "determined by looking at the circumstances which might understandably lead usually [uncounseled] prisoners to fail to grieve in the normally required way." *Daughtrey v. City of New York*, No. 11-CV-9693, 2012 WL 4849137, at *3 (S.D.N.Y. June 29, 2012) (quoting *Giano v. Goord*, 380 F.3d 670 678 (2d Cir. 2004)), *adopted in full*, 2012 WL 4854720 (S.D.N.Y. Oct. 12, 2012) (Engelmayer, J.).

A number of Defendants argue that Randle failed to exhaust his administrative remedies. Sergeant Alexander and C.O.s Nelson and Hanaman contend that Randle cannot sue them in this forum because (1) he did not name them in grievances about the Green Haven Fight and (2) his grievances did not include all of the allegations contained in his Complaint.  (Def.'s Mem. at 18-19; Dkt. Nos. 274, 284.)  The Mental Health Defendants argue that Randle did not "comply with the DOCCS mandatory grievance procedure" with respect to claims arising from his requests to be transferred out of the Clinton GTP.  (Def.'s Mot. at 19.)

The first argument fails because a prisoner need not name individual defendants or articulate legal theories in a grievance to comply with the PLRA.  *See Jones*, 549 U.S. at 217

---

[3] In the Opinion denying Defendants' motion to dismiss Randle's Third Amended Complaint, the Court concluded that all of the *Hemphill* factors survive the Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 81 (2006).  *See Randle v. Alexander*, 960 F. Supp. 2d 457, 484 n.5 (S.D.N.Y. 2013) (Oetken, J.); *see also Stevens v. City of New York*, No. 12-CV-1918 (JPO), 2012 WL 4948051, at *6 (S.D.N.Y. Oct. 12, 2012) (addressing *Hemphill* and *Woodford*).

("[N]othing in the [PLRA] imposes a 'name all defendants' requirement"); *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009) (holding that the PLRA does not require a New York state prisoner "to name particular officials who are allegedly responsible for misconduct . . . in order to later bring suit against those officials in federal court."); *Mena v. City of New York*, No. 12-CV-6838, 2013 WL 1352081, at \*5 (S.D.N.Y. Apr. 4, 2013), *adopted in full*, 2013 WL 3580057 (S.D.N.Y. July 10, 2013) ("[A]s in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." (quoting *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006))).

Here, Randle filed a grievance alleging that correctional officers encouraged the Green Haven Fights and fabricated "a misbehavior report that was . . . contrary to the facts."  (Dkt. No. 293 ¶ 54 (citing Cailteux Decl. Ex. 20 ("February 2, 2009 Inmate Grievance Compl.")).)  He appealed that grievance to the CORC, thereby exhausting his remedies in the New York State prison system.  The fact that Randle's grievance did not describe his allegations in legal terms or name all the officers he now sues does not bar him from proceeding in this Court.  Randle's actions were sufficient to comply with the PLRA with respect to all claims arising out of the Green Haven Fights, including claims against correctional officers who were not specifically named.

As to the Mental Health Defendants, Randle filed a grievance at Clinton in which he sought to be transferred out of the SHU.  (Dkt. No. 297-27.)  In response to that grievance, Clinton's Superintendent informed him that "reconsideration of his SHU time" was "non-grievable" pursuant to DOCCS policy and that he should address his concerns to DOCCS central office.  (Dkt. No. 292-32.)  Randle appealed to the CORC and, two days after it upheld the

Superintendent's decision, wrote a letter to DOCCS official objecting to his continued confinement in the GTP.

Defendants contend that these actions are insufficient to exhaust Randle's "mental health deliberate indifference [claim] for failure to transfer from the Clinton GTP."  (Def.'s Mot. at 20.)  They argue that Randle should have filed formal grievances against them challenging the denial of his transfer requests and his ongoing confinement in the GTP.  Randle argues that, while he did not file additional grievances addressing his continued confinement in the SHU, he reasonably believed that "formal grievance channels were closed to him in relation to complaints regarding his transfer from the GTP (the most restrictive of SHU programs)."  (Dkt. No. 291 at 21.)

Randle's argument prevails.  Randle filed a grievance seeking to have his "SHU time . . . depleted" and appealed the Superintendent's determination that DOCCS policy rendered his "SHU time . . . non-grievable."  (*See* Dkt. No. 292-27.)  In light of the CORC's opinion upholding the Superintendent's decision, which expressly disclaimed jurisdiction over Randle's SHU sentence, it was reasonable for Randle to believe he could no longer file grievances about his desire to be transferred to a less restrictive mental healthcare program.  To the extent that Randle did not exhaust administrative remedies related to claims arising from the denial of his requests to leave the Clinton GTP, special circumstances justified his actions.  *Hemphill*, 380 F.3d at 686; *see Taylor v. Swift*, 21 F. Supp. 3d 237, 243 (E.D.N.Y. 2014) ("Even if plaintiff erred in interpreting the scope of [a prison directive listing his complaint as non-grievable], his mistake was reasonable and his non-exhaustion does not provide a basis for dismissing the claims . . . ."); *Smith v. City of New York*, No. 12-CV-3303, 2013 WL 5434144, at *27 (S.D.N.Y. Sept. 26, 2013) ("[S]pecial circumstances may justify [plaintiff's] failure to exhaust

his administrative remedies because [an officer] allegedly misrepresented that his issue was non-grievable.").

### B.     Failure to Intervene

The Eighth Amendment, which applies to states through the Fourteenth Amendment, prohibits "cruel and unusual punishments."  U.S. Const. amend VIII.  To establish an Eighth Amendment violation, a prisoner must show both that the deprivation of his right to be free from cruel and unusual punishment was "sufficiently serious" and that the defendant acted with a "sufficiently culpable state of mind."  *Randle*, 960 F. Supp. 2d at 470 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "In the context of prison conditions, courts have defined this culpability as 'deliberate indifference' to the health and safety of inmates."  *Id.* (citations omitted).

Randle asserts that the Guard Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by using excessive force against him.[4]  He argues that C.O. Benitez violated his rights directly and that the other Guard Defendants subjected themselves to liability by failing to intervene to protect his Eighth Amendment rights.  *Id.* at 472 n.2; *see also Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (stating the standard for a failure to intervene claim).

C.O. Nelson moves for summary judgment on Randle's excessive force claim.  He argues that he cannot be liable for failure to intervene because "the evidence shows that he was simply

---

[4] Randle's first Eighth Amendment claim against the Guard Defendants and Sergeant Alexander is based on three distinct theories of liability: (1) excessive force; (2) failure to protect; and (3) denial of the right to reasonably safe conditions of confinement.  *Randle*, 960 F. Supp. 2d at 472-75.  In the Opinion denying Defendants' motion to dismiss, the Court held that Randle had stated a claim under all three theories of liability.  *Id.*  Because C.O. Nelson moves for summary judgment only on Randle's excessive force claim, the Court need not and does not address the other two theories.

not present" during the second Green Haven Fight.  (Def.'s Mot. at 20.)  Randle avers that C.O.

Nelson was in the Bubble when the fight began and left shortly thereafter "without taking any

action to ensure the inmates had been secured."  (Dkt. No. 293 ¶ 40; Dkt. No. 291 ("Pl.'s Opp.")

at 22-23.)  The parties thus genuinely dispute a material fact, namely, whether C.O. Nelson was

present at any point during the second fight.  A genuine dispute of material fact therefore

precludes summary judgment on this claim.  *Curry*, 316 F.3d at 333.

### C.    Conspiracy

Randle claims that the Guard Defendants engaged in a conspiracy to violate his Eighth

Amendment rights in violation of 42 U.S.C. § 1983.  He argues, specifically, that the Guard

Defendants conspired to force him to fight Johnson and then coordinated a cover-up of the Green

Haven Fights.

To prove a conspiracy claim under § 1983, a plaintiff must show: "(1) an agreement

between two or more state actors[;] (2) to act in concert to inflict an unconstitutional injury;

[and] (3) an overt act done in furtherance of that goal causing damages."  *Tolliver v. Ercole*, No.

08-CV-4023, 2010 WL 1222053, at *4 (S.D.N.Y. Mar. 29, 2010) (citations and alternations

omitted).  Plaintiffs may make this showing through "either . . . direct or circumstantial

evidence."  *Stein v. Janos*, 269 F. Supp. 2d 256, 261 (S.D.N.Y. 2003).  "To survive a motion for

summary judgment, a plaintiff's evidence of a [§ 1983] conspiracy must, at least, reasonably lead

to the inference that the defendants positively or tacitly came to a mutual understanding to try to

accomplish a common and unlawful plan."  *Id.* at 261-62 (citation and internal quotation marks

omitted).

Defendants present three arguments for summary judgment on Randle's conspiracy

claim.  (Def.'s Mot. at 23-25; Dkt. No. 265 ("Benitez Mot.") at 3.)  C.O. Nelson argues, first,

that C.O. Benitez never threatened Randle, and second, that there is no evidence of a cover-up by the prison officers. (Def.'s Mot. at 24-25.) Defendants' third argument, which C.O.s Benitez, Monzon, and Nelson advance, is that Randle cannot assert a claim based on a false misbehavior report because he has no right to a truthful report. (*Id.* at 25-26; Benitez Mot. at 9.)

Each of these arguments fails. The assertion that C.O. Benitez never threatened Randle does not warrant summary judgment because it conflicts with Randle's sworn account of the facts. (*See* Pl.'s Opp. at 24-25 (citing Dkt. Nos. 60, 293).) Whether Randle's version of events is credible is a question for the factfinder.

As to the alleged cover-up, Randle avers that, in the presence of prisoners and other officers, C.O. Benitez threatened to conceal forced fights. He also states that, after forcing him to fight Johnson, the Guard Defendants spent five hours together writing one- to two-page incident reports in the same room. (Pl.'s Opp. at 26 (citing Dkt. No. 293 ¶¶ 44-46.).) Randle cites Sergeant Alexander's "three sentence[]" report, which "referred to [the Guard Defendants'] reports," as further proof that the prison officers "coordinate[d] their stories." (*Id.*) Construing the evidence in the light most favorable to Randle, and drawing all inferences in his favor, the Court concludes that Randle has presented sufficient circumstantial evidence to create a genuine dispute as to whether the Guard Defendants conspired to conceal their role in the Green Haven Fights.

As to Defendants' third argument, Randle need not have a right to a truthful misbehavior report to allege an unconstitutional conspiracy. Randle has not sued to contest the misbehavior report; he cites that report, and the circumstances under which it was written, as evidence of a conspiracy to conceal a fight that led to a prisoner's death. Any agreement between prison officers to effectuate or conceal a forced fight is an "act in concert to inflict an unconstitutional

injury" in violation of § 1983. *Randle*, 960 F. Supp. 2d at 475. Because material questions about the existence of such an agreement remain, the motion for summary judgment on Randle's conspiracy claim is denied.[5]

**D.    Supervisory Liability**

A defendant must have been personally involved in the alleged conduct to be liable under § 1983. *Randle*, 960 F. Supp. 2d at 477 (citation omitted). Accordingly, "the doctrine of *respondeat superior* does not apply" to § 1983 claims. *Id.* (quoting *Harrison v. Goord*, No 07-CV-1806, 2009 WL 1605770, at *9 (S.D.N.Y. June 9, 2009)) (alteration omitted). However, a correctional officer who serves as a supervisor may be liable under § 1983 if:

> (1) [he] participated directly in the alleged constitutional violation, (2) [he], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) [he] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) [he] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) [he] exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 477-78 (quoting *Colon v. Coughlin*, 58 F. 3d 865, 873 (2d Cir. 1995)) (citing *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003)).

Randle asserts both his cruel and unusual punishment claim and his § 1983 conspiracy claim against Sergeant Alexander under a theory of supervisory liability. As the Court explained in the Order denying Defendants' motion to dismiss, "Randle alleges that Alexander was personally involved in the unconstitutional behavior of the Guard Defendants [because] he was

---

[5] In their briefs, Sergeant Alexander and the Guard Defendants move for summary judgment on Randle's "alleg[ation] that [they] wrote false reports." (Def.'s Mot. at 25; *see also* Dkt. No. 265 at 9.) Defendants Benitez and Monzon also move for summary judgment on Randle's "claim for improper cell searches or property deprivation." (Dkt. No. 265 at 7.) Randle responds that he has never alleged independent constitutional claims based on false reports, searches, or property deprivation. (Pl.'s Opp. at 26; Dkt. No. 277.) The Court concurs that no such claims have been asserted, and accordingly, need not address these arguments for summary judgment.

'grossly negligent in managing [those officers]' and [because he] 'implicitly created and/or allowed an informal policy'" to persist wherein the violations were able to occur.  *Id.* (second alteration in original) (citing Compl. ¶ 126).)  Defendants now argue that Randle "cannot put forth any evidence to support these claims beyond mere speculation."  (Def.'s Mot. at 28.)

        Randle responds to Defendants' argument by citing a number of sworn facts. Specifically, he contends that Sergeant Alexander: (1) testified that he never gave his officers "training updates" on how to break up fights; (2) "admitted [in a deposition that] he did not know whether DOCCS had any policies or procedures concerning correctional officers forcing inmates to fight each other"; (3) admitted he did not know whether C.O.s Benitez and Monzon should have activated their personal alarms during the Green Haven Fights; (4) did not know whether it was against DOCCS policy to place inmates in the mantrap unrestrained; (5) interviewed the Guard Defendants about the fight together rather than separately; (6) allowed officers to write their incident reports together in the same room for five hours; (7) used the officers' reports for his own incident report rather than drafting a statement of his own; (8) did not recommend counseling of the Guard Defendants after the Green Haven Fights; (9) "adamant[ly]" opposed discipline despite findings by the IG's Office that Randle's allegations were "substantiated"; and (10) testified under oath that he could not identify any instance in which he had sided with an inmate over an officer.  (Pl.'s Opp. at 28-30; Dkt. No. 293 ¶¶ 42-53.)  Randle also avers that, when Sergeant Alexander arrived at the scene of the second fight, he referred to Johnson, who later died of his injuries, as a "piece of shit lying on [his] floor."  (Dkt. No. 293 ¶ 42.)

        In citing these specific examples, and presenting testimony and documents to support them, Randle has raised a material question of fact as to whether Sergeant Alexander's conduct constituted the sort of gross negligence, deliberate indifference, or direct participation that is

required to sustain a claim for supervisory liability under § 1983.  Assessing the veracity of testimony presented by Randle and Sergeant Alexander, and choosing between the parties' versions of events, is a "matter[] for the jury, not for the court on a motion for summary judgment." *Curry*, 316 F.3d at 333.  Sergeant Alexander's motion for summary judgment is therefore denied.

### E.   Deliberate Indifference Claims

"The Eighth Amendment forbids deliberate indifference to serious medical needs of prisoners, which includes needs for mental health care." *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (internal citations and quotation marks omitted). To establish an Eighth Amendment violation, the plaintiff must show, first, that "the alleged deprivation of adequate medical care [was] sufficiently serious," and second, that the defendants were "subjectively reckless in their denial of medical care." *Id.* (internal citations and quotation marks omitted).

In determining the seriousness of a medical condition, courts consider "(1) whether a reasonable doctor or patient would find it important and worthy of comment; (2) whether the condition significantly affects an individual's daily activities; (3) and whether it causes chronic and substantial pain." *Randle*, 960 F. Supp. 2d at 480 (citing *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)) (alterations and internal quotation marks omitted).  In assessing the subjective prong of the deliberate indifference standard, courts ask whether the defendant acted or failed to act while aware of "a substantial risk that serious inmate harm [would] result." *Salahuddin*, 467 F.3d at 280.

Randle asserts deliberate indifference claims against Marinelli and the Mental Health Defendants.  He argues that Marinelli recklessly disregarded his risk of suicide and that the

17

Mental Health Defendants refused to transfer him out of the GTP despite repeated recommendations from his mental health "treatment teams." (Pl.'s Opp. at 30-38.)

### 1.    Defendant Marinelli

Marinelli makes three arguments for summary judgment.  He argues that (1) the care he gave Randle was objectively reasonable; (2) there is no evidence that he "acted with a sufficiently culpable state of mind"; and (3) Randle's ten-year sentence to solitary confinement, rather than Marinelli's care, was what caused his suicide attempt on April 16, 2009.  (Def.'s Mot. at 30-34.)

The first argument fails because there is a genuine dispute about the treatment that Randle received.  (Def.'s Mot. at 34.)  Marinelli contends that he "performed daily visits" to Randle and assessed him as a low suicide risk because he "never told anyone . . . he was suicidal [or] . . . exhibited behavior indicative of suicidal tendencies." (*Id.* at 33.)  Randle asserts that Marinelli met with him only three times over more than two months, and that as a result of merely "skimming" his mental health records, had a "near complete lack of knowledge regarding [his] prior history of suicidal tendencies" and "auditory hallucinations." (Pl.'s Opp. at 33.) There remain basic, material questions of fact about the care Randle received from Marinelli, and whether that care was objectively reasonable.

As to the subjective prong of deliberate indifference analysis, Randle argues that Marinelli had access to and ignored his history of suicide attempts, conducted a cursory review of his mental health records, wholly failed to review his medical records, and knew that he was "undergoing stress because of the [Green Haven] fight." (Pl.'s Opp. at 34.)  Randle also avers that Marinelli "brushed [him] off," told him "lay down," and said he would "get over it" when Randle reported that he did not "feel safe being in the cell by [him]self." (*Id.* at 33 (citing Dkt.

No. 293 ¶ 87); Dkt. No. 293 ¶ 12.)  These sworn assertions raise material questions of fact about whether Marinelli acted with "a mental state equivalent to subjective recklessness, as that term is used in criminal law." *Randle*, 960 F. Supp. 2d at 480; *see also Farmer*, 511 U.S. at 835 (noting that the subjective element of deliberate indifference entails "more than mere negligence" and "less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result").  In such circumstances, summary judgment is inappropriate.

Finally, as to causation, Marinelli need not be the reason Randle felt suicidal to be liable for deliberate indifference to the suicide risk that he posed.  Randle has raised material questions of fact about whether Marinelli engaged in subjectively reckless and objectively unreasonable conduct in violation of the Eighth Amendment.  The motion for summary judgment on Randle's first deliberate indifference claim is denied.

### 2.    Mental Health Defendants

The Mental Health Defendants present two arguments for summary judgment.  First, they assert that Randle's care in the GTP was objectively reasonable because the GTP program model "met or exceeded national and state standards."  (Def.'s Mot. at 36.)  Second, they argue that their refusal to transfer Randle from the GTP was motivated by security concerns, and thus, that they lack the requisite mental state for a deliberate indifference claim.  (*Id.* at 36-40.)

The fact that the GTP program model conforms to correctional standards does not mean that all prisoners in the GTP have automatically received constitutionally adequate care.  "[T]he objective component of an Eighth Amendment claim is necessarily contextual and fact-specific." *Williams v. Smith*, No. 02-CV-4558, 2009 WL 2431948, at *8 (S.D.N.Y. Aug. 10, 2009) (quoting *Smith v. Carpenter* 316 F.3d 178, 185 (2d Cir. 2003)).  In this case, Randle avers that prison officials recklessly interfered with his mental healthcare by ignoring repeated

recommendations from his treatment team to transfer him to a less restrictive mental health

program.  Randle avers that he has "psychotic disorder and personality disorder," as well as a

"history of self-harm and multiple suicide attempts," and that continued confinement in the

GTP—which was supposed to be a short-term program—exacerbated his mental state.  (Dkt. No.

293 ¶¶ 70-71, Pl.'s Opp. at 41.)  He also states that two of his suicide attempts, on April 15,

2010, and April 18, 2010, occurred days after DOCCS officials canceled a transfer that had

already been approved.  (Dkt. No. 293 ¶¶ 121-124.)  This Court has already held that "Randle's

allegations [against the Mental Health Defendants], if true, state objectively serious

deprivations."  *Randle*, 960 F. Supp. 2d at 481.  Whether Randle's account of his treatment is

accurate depends on the credibility of witness testimony and resolution of disputed questions of

material fact.

As to Defendants' mental state, the parties present two different versions of the facts.

The Mental Health Defendants contend that they refused to transfer Randle because he presented

a legitimate security risk.  (Def.'s Mot. at 38.)  To support this argument, they cite Randle's

history of "problematic behavior."  (*Id.* at 40.)  Randle argues that the Mental Health Defendants

invoked DOCCS security policies "to punish [him] for the outcome of the Force Fight."  (Pl.'s

Opp. at 41.)  He notes that his treatment providers recommended transfer multiple times between

May 4, 2009, and July 1, 2010, with full knowledge of his disciplinary record.  (*Id.*; *see also* Dkt.

No. 293 ¶¶ 105-135.)  Randle also cites an email, written in May 2010 shortly after his treatment

team recommended transfer, in which one Mental Health Defendant wrote to another: "Hope we

can fill [vacancies in a less restrictive program] . . . but not with Randle! :) ."  (Dkt. No. 293

¶ 128.)

Construing the evidence in the light most favorable to Randle, and drawing all inferences

in his favor, the Court concludes that Randle has raised a genuine dispute of material fact about

whether the Mental Health Defendants refused his transfer for punitive reasons, evincing

deliberate indifference to his serious medical needs.  *See Bussey v. Fischer*, No. 10-CV-1021,

2011 WL 4862478, at *11 (N.D.N.Y. Aug. 1, 2011) (quoting *Harrison v. Barkley*, 219 F.3d 132,

138 (2d Cir. 2000)), *adopted in full*, 2011 WL 4499324 (N.D.N.Y. Sept. 27, 2011) ("[I]f prison

officials consciously delay or otherwise fail to treat an inmate's serious medical condition 'as

punishment or for other invalid reasons' . . . such conduct is actionable as deliberate

indifference.").  The motion for summary judgment on Randle's second deliberate indifference

claim is denied.

### F.      Qualified Immunity

The doctrine of qualified immunity protects prison officials from liability if "their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d

Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To resolve qualified

immunity claims, courts first consider whether the plaintiff "has shown facts making out

violation of a constitutional right."  *Id*.  Courts then assess whether the right at issue was "clearly

established," and even if it was, whether it was "objectively reasonable" for the official to

believe his conduct was lawful.  *Id.* (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 133-34

(2d Cir. 2010)).

Eleven Defendants—C.O. Nelson, Sergeant Alexander, Marinelli, and the Mental Health

Defendants—assert qualified immunity in this case.  For the reasons outlined above, Randle has

presented enough evidence to make out violations of his Eighth Amendment rights against each

of these Defendants.  The question is whether those rights were clearly established during his

incarceration at Green Haven, Upstate, and Clinton.

Sergeant Alexander and C.O. Nelson argue that "it was objectively reasonable for [them]

to believe [their] actions did not violate clearly established law."  (Def.'s Mot. at 44.)  The Court

rejected this argument when it denied Defendants' motion to dismiss.  *See Randle*, 960 F. Supp.

2d at 479 ("[T]here can be no serious contention on the part of Defendants that it is objectively

reasonable to threaten inmates until they agree to fight each other in front of prison officials.  In

sum, not only did Defendants' behavior—as alleged in the Complaint—violate Randle's clearly

established constitutional rights, but it was also objectively unreasonable.").  Sergeant Alexander

and C.O. Nelson renew their arguments now on the grounds that they (1) "were not present at the

time of any of the fights," and (2) "did not violate any of [Randle's] constitutional rights."

(Def.'s Mot. at 44.)  These are contested assertions of fact, not rationales for immunity.  There

remains no serious contention that it was objectively reasonable for Sergeant Alexander and C.O.

Nelson to engage in the conduct alleged.  The only issue is whether Defendants in fact acted as

Randle alleges they did.

As to the remaining Defendants, a prisoner's right to be free from deliberate indifference

to his serious medical needs has been clearly established for decades.  *Estelle v. Gamble*, 429

U.S. 97, 103 (1976) ("[T]he [Eighth] Amendment proscribes more than physically barbarous

punishments. . . . [Supreme Court precedents] establish the government's obligation to provide

medical care for those whom it is punishing by incarceration."); *see also Farmer*, 511 U.S. at

828 ("A prison official's 'deliberate indifference' to a substantial risk of serious harm to an

inmate violates the Eighth Amendment."); *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir.

1989) ("We think it plain that from the legal standpoint [that] psychiatric or mental health care is

an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble* that it must be provided to prisoners." (citation omitted)).

Marinelli argues that it was not clearly established that "any action or inaction by him violated [Randle's] Eighth Amendment rights to adequate mental healthcare."  (Def.'s Mot. at 45.)  This argument conflates whether a right is clearly established with whether a defendant is liable in a particular case.  There is no question that Randle's right to constitutionally adequate healthcare was established when Marinelli provided treatment at Upstate, and that if Marinelli acted as Randle avers, a "rational trier of fact" could find in his favor.  *Ricci*, 557 U.S. at 586; *see Sinkov v. Americor, Inc.*, 419 F. App'x 86, 89 (2d Cir. 2011) (holding that the evidence was sufficient "to support a conclusion by a reasonable juror that [defendant] was actually aware of [plaintiff's] risk of suicide and was deliberately indifferent to that risk" (internal quotation marks omitted)); *Allah v. Kemp*, No. 08-CV-1008, 2010 WL 5860290, at *8-9 (N.D.N.Y. Nov. 9, 2010), *adopted in full*, 2011 WL 705210 (N.D.N.Y. Feb. 22, 2011) (rejecting a qualified immunity argument "in [the] inmate suicide context").

The Mental Health Defendants' argument for qualified immunity also fails.   It is clearly established that prison officials may not punish a prisoner by denying, delaying, or interfering with his medical treatment.  *Estelle*, 429 U.S. at 104-05 ("[D]eliberate indifference . . . constitutes the 'unnecessary and wanton infliction of pain,' . . . whether the indifference is manifested by prison doctors in response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment . . . ." (footnotes and citation omitted)); *see also Thomas v. Ashcroft*, 470 F.3d 491, 497 (2d Cir. 2006) (reversing dismissal of a deliberate indifference claim where prison officials allegedly "knew of [a prisoner's] urgent medical needs but ignored them, and nevertheless

ordered or acquiesced in his transfer to a facility where he received no medication"); *Smith*, 316

F.3d at 186 n.10 ("[W]hen a degenerative medical condition is neglected over sufficient time, the

alleged deprivation of care . . . may properly be viewed as a 'refusal' to provide medical

treatment."); *Hernandez v. Keane*, No. 97-CV-1267, 2000 WL 16951, at *3 (S.D.N.Y. Jan. 7,

2000) (citing *Estelle*, 429 U.S. at 104-05) ("Deliberate indifference is shown when prison

officials intentionally deny, delay access to or interfere with prescribed treatment.").  No

reasonable prison official would have believed it was lawful to keep Randle in the GTP in order

to punish him, despite repeated recommendations to transfer him from his healthcare providers.

The question in this case is whether the Mental Health Defendants were in fact motivated by

legitimate security concerns.  That is a question for the factfinder rather than the Court.

## IV.    Conclusion

For the foregoing reasons, Defendants' motions for summary judgment are DENIED.

The parties are directed to confer regarding trial dates and to submit a joint letter by March 22,

2016, proposing trial dates in April, May, or June 2016.

The Clerk of Court is directed to close the motions at Docket Numbers 239, 240, and

241.

SO ORDERED.

Dated:  March 16, 2016
        New York, New York

_____
            J. PAUL OETKEN
        United States District Judge